UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

BERNARD V. TEW,
Individually and as Trustee on Behalf of,
BLUEGRASS RETIREMENT GROUP TRUST

AND

BLUEGRASS RETIREMENT GROUP
TRUST,

      Plaintiffs,

v.

MCML LIMITED,

      Defendant.

## **COMPLAINT AND JURY TRIAL DEMAND**

Bernard V. Tew ("Tew"), individually and as trustee on behalf of Bluegrass Retirement

Group Trust ("Bluegrass"), and Bluegrass (together with Tew, "Plaintiffs"), through their

undersigned attorneys, by way of this Complaint, sue Defendant MCML Limited, f/k/a ED&F

Man Capital Markets, Ltd. ("ED&F") for federal racketeering, wire fraud, and embezzlement from

pension and welfare funds pursuant to RICO, 18 U.S.C. § 1962 *et seq.*, and fraud, breach of

contract, breach of fiduciary duty, conversion, unjust enrichment, and equitable indemnification,

under state common law.  Plaintiffs' allegations are based on actual knowledge as to themselves,

and on information and belief as to others.  Plaintiffs' information and belief is based upon:  review

of various documents related to the allegations herein, review of publicly filed documents, and

investigation by Plaintiffs' counsel, including information produced by ED&F in other proceedings and obtained by Plaintiffs.

## SUMMARY OF ACTION

1.      This action involves a diabolical scheme orchestrated by ED&F to take advantage of the tax-exempt status in foreign countries of pension plans managed by Tew, including Bluegrass, to make fake securities trades, issue fake tax vouchers to a host of European governments, and steal *hundreds of millions of dollars* in tax refunds, all the while falsely assuring Tew that it was engaged in a legal trading strategy for his benefit, and then pinning the whole thing on Tew as soon as the tax authorities sought to recover their money.

2.      ED&F failed to abide by its contractual and fiduciary obligations to Plaintiffs to legitimately provide securities clearing, custody and trading services to Plaintiffs for the purpose of a supposed dividend arbitrage strategy, while—unbeknownst to Plaintiffs—running a corrupt and criminal enterprise involving illegal securities trading, falsified documentation, and fraudulent tax refund applications filed with several European countries.   ED&F's fraud damaged not only those foreign governments, but also Plaintiffs, who were unknowingly used to facilitate the scheme, had their investments and legitimate profits stolen by ED&F, and were left holding the bag for *millions of dollars* in alleged foreign government losses.

3.      Bluegrass was necessary for ED&F to carry out its scheme because under tax treaties between the U.S. and various European countries, U.S. pension plans are exempt from taxes on dividend payments that are otherwise withheld by the European tax authorities.  ED&F therefore targeted U.S. pension plans (including Bluegrass) so that it could pretend to execute a legal "dividend arbitrage strategy" on its behalf and share the profits from tax refunds obtained

from the European tax authorities with the U.S. plan.  In reality, ED&F used Bluegrass and Tew to facilitate, and then take the fall for, its unlawful activities.

4.       In a typical dividend arbitrage transaction, an entity (like a pension plan) organized under the laws of a country that has a tax treaty with a foreign country purchases shares in a company organized under the laws of that foreign country that has announced it intends to issue a dividend.  Once the dividend is issued, the purchaser submits a refund voucher to the foreign country's tax authority to obtain a percentage of the dividend that is otherwise withheld under the foreign country's tax laws.  U.S. pension plans have legally benefitted for years from such transactions by trading, through foreign brokers, in shares of foreign companies and collecting the dividend tax refunds in cash. Additionally, foreign pension plans benefit from similar transactions with U.S. brokers and U.S. company dividends where such tax treaties exist.

5.       Between 2012 and 2015 (the "Relevant Period"), ED&F was contracted to conduct legal, dividend arbitrage trading on behalf of Plaintiffs.  Instead, under the guise of such transactions, ED&F defrauded tax authorities across Europe by executing on behalf of Plaintiffs what are called "cum-ex" trades, in which the settlement dates of the trades were deliberately delayed in order to improperly obtain multiple tax vouchers and refunds where a dividend was never acquired.

6.       Specifically, ED&F's cum-ex trading involved the use of an ED&F-affiliated or third-party "seller" to conduct circular transactions in which the seller sold shares (which it did not have) to Plaintiffs prior to the date of the dividend at a higher share price that factored in the future dividend, and then bought back the shares from Plaintiffs following the dividend at the lower, ex-dividend share price.  Because the settlement date for all trades was after the ex-dividend date, no dividends were obtained, but ED&F nonetheless issued tax vouchers for the trades.

7.      Moreover, when ED&F did not have enough shares on hand to settle cum-ex trades following the issuance of a dividend, it would reuse shares obtained through legitimate trading (and for which ED&F already had issued tax vouchers) and issue another tax voucher to the purchaser, such that frequently multiple tax vouchers were issued for the same shares. Alternatively, ED&F would purchase ex-dividend shares (for which no dividend was due) and issue a tax voucher regardless.

8.      Bluegrass is one of more than 270 U.S. pension plans that ED&F used as a conduit to conduct these fraudulent transactions, wiring tens of millions of dollars through Bluegrass' brokerage account alone during the course of the scheme.  ED&F generated a number of documents for Plaintiffs detailing and describing these transactions, including trading ledgers and account statements, which convinced Plaintiffs that the transactions had in fact occurred and that the tax withdrawal funds had been legitimately obtained.

9.      Beginning in 2015, Tew tried to no avail to access the Bluegrass brokerage account to retrieve its funds and close it out.  ED&F evaded Tew for years.  Through later correspondence between counsel for Plaintiffs and ED&F, however, Plaintiffs determined that the account had been fully emptied and its funds could not be accessed.  In all, over $70 million was removed from Bluegrass' account and, on information and belief, was embezzled by ED&F.

10.     It was not until early 2018, when the European press began to uncover the cum-ex scandal and the Danish tax authority (Skatteforvaltningen, or "SKAT") sued many pension plans it claimed were ultimately responsible for the fraudulent transactions, that the entirety of this scheme began to come to light.

11.     In June 2018, SKAT sued Plaintiffs and other pension plans managed by Tew for approximately $39,000,000, forcing Tew into bankruptcy.  Facing economic hardships, Tew

determined he was unable to mount an adequate defense and instead settled with SKAT for an allowed claim of approximately $34,000,000.

12.     Since then, ED&F's role in the corrupt and criminal enterprise has been revealed. Discovery in the SKAT actions has shown that ED&F engaged in illegal trading and issued thousands of fraudulent tax vouchers to foreign governments, including Denmark. Indeed, ED&F *admitted* before the High Court of Justice in the United Kingdom that certain tax vouchers it issued, including to Plaintiffs, were illegitimate. In November 2022, ED&F's London offices were raided by German and Danish investigators seeking information concerning the tax fraud. And in June 2023, the Financial Conduct Authority ("FCA")—the United Kingdom's financial regulator—fined ED&F 17.2 million pounds for "illegitimate" withholding tax reclaims from SKAT that ED&F made on behalf of clients.

13.     Plaintiffs bring this action to get the benefit of their bargain with ED&F for execution of a legitimate dividend arbitrage strategy, and to recover the damages they have incurred as a result of their being used as ED&F's pawns in its illegal scheme, which cost them not only significant financial investments, but also their business and their good name.

## PARTIES

14.     Plaintiff Tew is a citizen of the United States and resident of Woodford County, in the Eastern District of Kentucky.

15.     Tew served as a trustee and investment manager for Bluegrass during the Relevant Period, and he currently serves as a trustee for Bluegrass.

16.     Bluegrass is a trust forming part of a pension plan, profit sharing, or stock bonus plan qualified under section 401(a) of the United States Internal Revenue Code, exempt from

taxation under section 501(a) of the United States Internal Revenue Code, and a resident of the United States of America for purposes of U.S. taxation.

17.     At all relevant times, Bluegrass held Roth IRAs for Tew, his wife Andrea Tew, and his children Vincent Tew and Stephanie Tew Campbell.  During the Relevant Period, Bluegrass also held Roth 401(k) plans for each of the Tew family members.  At all relevant times, Bluegrass was located at 910 Aiken Road, Versailles, Kentucky 40383.

18.     During the Relevant Period, Defendant ED&F was a financial brokerage business and financial service provider authorized by the FCA and headquartered at 3 London Bridge Street, London, SEI 9SG, United Kingdom.  ED&F had offices in the United States at 140 East 45th Street, New York, New York 10017; 425 South Financial Place, Chicago, Illinois 60605; and 801 Brickell Avenue, Miami, Florida 33131.  ED&F advertised itself as a "global independent financial brokerage business" that "offers 24-hour coverage, supporting time zones from Sydney to the US East Coast."

19.     During the Relevant Period, ED&F managed and controlled a brokerage account for Bluegrass, executed trades in European securities for Bluegrass, provided documentation and information to Bluegrass in connection with its account and securities transactions, and collected fees in connection with Bluegrass' withholding-tax refund requests.

20.     In late 2022, ED&F's brokerage business was purchased by Marex Group plc ("Marex"), a global financial services provider headquartered at 155 Bishopgate, London, EC2M 3TQ, United Kingdom, and renamed "Marex Capital Markets."  Marex has offices in the United States at 360 Madison Avenue, Third Floor, New York, New York 10017 and 216 West Jackson Boulevard, Chicago, Illinois 60606.

21.     On or about September 11, 2023, ED&F changed its name from ED&F Man Capital Markets, Ltd. to MCML Limited.

## JURISDICTION

22.     This Court has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. §§ 1332, 1331 and 18 U.S.C. § 1964(c).  The Court also has jurisdiction over the non-federal claims pursuant to 28 U.S.C. §1367.

23.     This Court has personal jurisdiction over ED&F because ED&F's conduct giving rise to the claims was purposefully directed towards the Plaintiffs, who are residents of Kentucky, and because ED&F transacted business with Bluegrass, which is located in Kentucky.

24.     Venue is proper in this district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)(2).  Certain of the acts, events or omissions giving rise to the violations and causes of action complained of herein occurred in Woodford County, Kentucky, making venue proper in the Eastern District of Kentucky, Central Division at Lexington.

## FACTUAL ALLEGATIONS

### Tew Establishes Bluegrass and Sets up a Prime Brokerage Account with ED&F

25.     In early 2012, following a career as a quantitative equity and retirement hedge fund portfolio manager, Tew was asked by a businessman in Kentucky to manage his retirement accounts.  As one strategy to improve funding of the accounts, Tew recommended dividend arbitrage trading, with which Tew had some experience during his career, and which Tew noted would require a European broker and investment manager.

26.     Dividend arbitrage trading had been a well-known and oft-used strategy for managing U.S. pension plans for years.  The basis of the strategy is a dual tax treaty between the U.S. and another country that grant exemptions to U.S. pension plans from withholding taxes on

dividend income from foreign corporations.   Typically, the strategy would be executed by purchasing shares of the foreign corporation shortly before a dividend is to be paid, then reclaiming the tax withheld by that country's tax authority in cash through submission of a tax voucher.   In certain countries, such as Denmark, an individual tax voucher is required for each transaction, and in other countries, like the Netherlands, one can receive a general tax voucher that permits a bank processing the transaction to pay the taxes to the purchaser immediately and prior to withholding.

27.     In early 2012, more than 700 U.S. pension plans were actively engaged in dividend arbitrage trading using various prime brokers in countries throughout Europe, Asia, and South America.   Tew sought to conduct the strategy to fund the pension plans he was managing in European countries, including Denmark, the Netherlands, Belgium, Switzerland, Sweden, and Finland.

28.     After receiving approval to engage in the dividend arbitrage strategy, Tew established pension retirement trusts for the corporate retirement plans Tew was asked to manage, as well as a pension retirement trust—Bluegrass—holding retirement plans for Tew and his family members.   Tew served as uncompensated trustee and investment manager for Bluegrass and all the plans within it.

29.     As he was not licensed to trade securities outside the United States, Tew had to hire a sub-manager for European investments.   Through his contacts at investment banks in Europe, Tew was introduced to Arunvill Capital UK Limited ("Arunvill"), whom he hired to manage his European investments.

30.     Arunvill connected Tew with ED&F, and ED&F led Tew to establish prime brokerage accounts to facilitate a dividend arbitrage strategy for the plans he was managing, including Bluegrass.   In February 2012, Tew and ED&F executed various agreements (the

"Agreements") that established ED&F's contractual obligations as broker-custodian for Bluegrass. The Agreements included a Custody Agreement, Security and Set-Off Deed, ISDA Master Agreement, and Global Master Securities Lending Agreement.

31.     Under the Agreements, ED&F was required to use "all reasonable care" in performing its obligations under the Agreements, including buying or selling securities for Bluegrass, keeping records and statements concerning Bluegrass' securities, and crediting all income, dividends, and proceeds on Bluegrass' securities only after actual receipt and reconciliation.

32.     For example, Section 11(a) of the Custody Agreement between Bluegrass and ED&F, dated February 29, 2012, states that ED&F "shall use all reasonable care in performing its obligations under this Agreement and shall look after the Client Securities with all reasonable care."  Section 11(b) of the Custody Agreement states that "[i]ncome, dividends and redemption proceeds on the Client Securities will only be credited (net of Taxes) after actual receipt and reconciliation."  Sections 12(a) and 12(b) of the Custody Agreement state that ED&F "shall keep all records and statements as may be necessary to give the Client a complete record of all Client Property held by it on behalf of the Client from time to time and of all material actions taken by it pursuant to this Agreement" and "shall provide the Client with a statement of Client Property held by the Custodian on behalf of the Client at intervals to be agreed with the Client."

33.     In addition, under Section 4(c) of the ISDA Master Agreement between ED&F and Bluegrass, also dated February 29, 2012, ED&F agreed to "comply in all material respects with all applicable laws and orders to which it may be subject if failure to so comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party."

34. ED&F's contractual obligations therefore required it to engage with reasonable care and in compliance with the law when conducting dividend arbitrage trading on behalf of Bluegrass, and prohibited it from, among other things, falsifying account statements, tax vouchers, or other documentation relevant to the Bluegrass brokerage account.

35. It was understood by all parties, as is customary, that Bluegrass would receive only a portion of the profits from any tax refund obtained through ED&F's trading and that ED&F, as the broker-custodian for Bluegrass, would receive a portion of the remaining profits as a fee for its services.

36. ED&F provided a loan to Bluegrass of approximately $20 million to facilitate early dividend arbitrage trading, which Tew agreed to pay back from the proceeds on investments he concurrently was engaged in using a different trading strategy. In 2013, Tew invested $29,262,594 in Bluegrass to offset the ED&F loan, which funds became immediately available to ED&F to trade.

37. In connection with ED&F's trading, Arunvill acted as investment manager and served as the intermediary between ED&F and Bluegrass. Other than by email, ED&F communicated with Tew concerning the Bluegrass brokerage account through Arunvill, despite Tew's multiple requests to meet with ED&F in person to discuss the account and multiple attempts to discuss the account with ED&F by phone. However, ED&F sent documentation concerning the Bluegrass brokerage account, including account statements and trading ledgers, directly to Tew's email account.

38. Moreover, ED&F withdrew funds provided by Tew for trading on behalf of Bluegrass from an account Tew set up and paid for at Central Bank in Lexington, Kentucky. Any

investment returns sent by ED&F to Bluegrass during the Relevant Period (which were minimal) were transferred by ED&F to that Central Bank account.

**Plaintiffs Rely on ED&F to Exercise Due Care and Comply with the Law in Executing Trades on Bluegrass' Behalf and on the Accuracy of ED&F's Documentation**

39.     Between February 2012 and January 2015, ED&F facilitated Bluegrass' trading in shares of certain Danish, Dutch, Finnish, Belgian, and Swiss companies, among others.  Tew entrusted ED&F, as broker-custodian for Bluegrass, with the management and control of the Bluegrass brokerage account, including the execution of securities transactions and the preparation of any related documentation.

40.     Reflecting each transaction purportedly conducted, ED&F would provide Tew with supporting documents, including account statements and trading ledgers showing what transactions had occurred.  Examples of the account statements and trading ledgers generated by ED&F and received by Tew are attached as **Exhibit A**.  The documents Tew received purported to evidence that transactions were being completed that resulted in the crediting of dividends to the Bluegrass brokerage account.

41.     The account equity statements Tew received from ED&F throughout the Relevant Period showed that at least $72,009,431 was transferred into the Bluegrass prime brokerage account during that time.

42.     In countries where required, such as Denmark, ED&F also prepared tax vouchers for each transaction describing Bluegrass' holdings and related withholding taxes that ED&F knew would be submitted to tax jurisdictions for withholding-tax refunds.  Examples of such tax vouchers are attached as **Exhibit B**.

43.     In the tax vouchers, ED&F listed applicable dividend dates, described dividends received, and noted the withholding tax suffered.  ED&F stated it had "no beneficial interest in the

holding and will not be reclaiming the tax," and that the "dividends specified … were paid net of withholding tax."

44.     Neither Tew nor Bluegrass ever received the tax vouchers from ED&F.  Instead, ED&F submitted the vouchers directly to Global Equities, GmbH ("Global Equities"), a third-party payment-processing agent, which submitted the applications for refunds directly to the foreign tax authorities.  On information and belief, Global Equities would then pay ED&F for all refunds received from the tax authorities, and ED&F would distribute Bluegrass' portion of the profits to its prime brokerage account.

45.     The same was true for jurisdictions that did not require individual tax vouchers, like the Netherlands.  Tew did not receive any documentation that was sent to the tax authorities of those countries on behalf of Bluegrass.  Rather, on information and belief, ED&F submitted general applications to the tax authorities through Global Equities, which paid ED&F for all refunds received from the transactions, which in turn allocated to Bluegrass its portion of the profits.

46.     Tew signed Powers of Attorney on behalf of Bluegrass that gave authority to Global Equities "to do and perform any act or thing which may be required of it with regard to . . . matters relating to the process of withholding tax reclaims."

47.     At all relevant times, ED&F had a contractual and fiduciary duty to Bluegrass to act for the benefit of Bluegrass and to provide true and accurate documentation.  Plaintiffs reasonably relied on information provided by ED&F to believe that Bluegrass had the right to file claims for taxes withheld on their transactions by the tax authorities, and that Bluegrass was legally entitled to the funds it received from those claims.

48.     Plaintiffs also reasonably relied on ED&F's representations that it would exercise due care in conducting dividend arbitrage trading when they authorized Global Equities—through Tew—to request tax refunds from tax authorities through the signed Powers of Attorney and process payments from the tax authorities to ED&F.

49.     The truth concerning ED&F's corrupt and criminal enterprise was concealed from Plaintiffs until more information concerning the trading was revealed over the course of litigation among SKAT and the various pension plans that ED&F defrauded.

50.     Indeed, during the Relevant Period, when Tew asked for clarification about the large amount of transactions showing money moving between the Bluegrass prime brokerage account and ED&F according to the documentation he received from ED&F, he was informed that the profit margins were very small on the dividend arbitrage trades and thus the records were not at all unusual.  Tew had no basis to question ED&F's representations and reasonably accepted them as true.

**ED&F Embezzles Funds from the Bluegrass Account and Tries to Scapegoat Plaintiffs**

51.     In or around January 2015, Tew contacted Arunvill to close the prime brokerage accounts for the pension plans he was managing, including the Bluegrass account.  Arunvill informed Tew that he could close the account by completing swaps, and that the balance of the account would be transferred to an ED&F omnibus account that would hold the funds temporarily. Tew understood, as had been agreed with ED&F, that ED&F would then credit the plans with their share of the profits from the dividend arbitrage trading and distribute those funds to the plans, including Bluegrass.

-13-

52.     In or around July 2015, Tew attempted to contact both Arunvill and ED&F to retrieve the money that had been transferred from the plans' prime brokerage accounts.  He was unable to reach either party.

53.     Tew persisted, as he required the funds from the accounts to cover legal fees in an unrelated matter.  However, Arunvill had seemingly dissolved and could not be reached, and ED&F refused to engage with Tew directly.  Tew considered traveling to London to confront ED&F in person but was unable to do so in light of his financial constraints.

54.     In early 2019, Tew attempted to use the balance of funds in MSJJ Retirement Group Trust ("MSJJ")—a pension retirement trust he had set up for the corporate retirement plans he was asked to manage that, like Bluegrass, had a prime brokerage account with ED&F—as collateral for a swap involving some unrelated trades.  When those trades failed, the swap counterparty requested the funds from MSJJ.  Counsel for then-trustee of MSJJ reached out by email to ED&F's counsel to determine the status of MSJJ's brokerage account, including when the account had been closed and why, and what the balance of the account was at the time of closure.  ED&F's counsel responded that the account had been closed in January 2015 with a balance of zero.

55.     Plaintiffs later learned that all other prime brokerage accounts for the plans Tew had been managing—including the Bluegrass brokerage account—had been similarly closed by ED&F in January 2015 with a balance of zero.  Only a miniscule fraction of the funds that had entered the accounts (including approximately $1 million of the over $72 million that had passed through the Bluegrass account) had been ultimately transferred to Plaintiffs.

56.     Following these exchanges, in October 2019, ED&F's counsel sent a series of letters directed to Bluegrass and other pension plans managed by Tew by email notifying them that the Dutch Tax Authority ("DTA") had asked ED&F to pay for a supplementary levy related

to tax reclaim applications that had been issued to the DTA by ED&F (through Global Equities) on behalf of those plans. ED&F's counsel notified the plans that it had declined the invitation to pay the levy, and that the plans may be pursued by the DTA for the funds.

57.     On information and belief, ED&F withheld the brokerage account balances for all plans managed by Tew, including Bluegrass, without Plaintiffs' consent—including Tew's initial investment and any profits obtained from dividend arbitrage trading—and embezzled the funds.

58.     On information and belief, ED&F, through its counsel, attempted to cover up its embezzlement and assign any liability to Plaintiffs by suggesting in letters that the pension plans managed by Tew, rather than ED&F, were in possession of the funds that had been procured through ED&F's illegal cum-ex trading and fraudulent tax reclaim applications submitted to the DTA.

**Plaintiffs Are Targeted by SKAT and Take the Fall for ED&F**

59.     On June 14, 2018, SKAT launched 15 lawsuits against Tew, Bluegrass, and other pension plans managed by Tew in the Eastern District of Kentucky (the "SKAT Actions"). SKAT alleged that Tew and these plans defrauded them by submitting tax refund claims through Global Equities claiming shareholdings in Danish companies that did not exist, and by submitting tax vouchers through ED&F that similarly purported to show the claimants' non-existent shareholdings. SKAT also brought claims for aiding and abetting fraud, unjust enrichment, money had and received, and negligent misrepresentation.

60.     SKAT sought damages from Tew and the plans in the amount of withholding taxes paid by SKAT to the plans, as well as punitive damages, pre-judgment interest, fees, costs, and expenses. Together, SKAT alleged that Tew and the plans had fraudulently obtained approximately $39 million in withheld taxes.

61.     Plaintiffs were shocked to read the allegations in SKAT's complaints because they had previously understood, based on ED&F's representations, that the trades appearing on the documentation they had received from ED&F had been completed and the claims for tax withholdings were legitimately submitted.

62.     In October 2018, the SKAT Actions were transferred to the multi-district litigation ("MDL") in the Southern District of New York, Case No. 1:18-md-02865.  The MDL consisted of 140 actions against various U.S. pension plans which, like Bluegrass, had submitted claims to SKAT for tax withholdings on dividends from Danish companies.

63.     The SKAT Actions severely damaged Tew's reputation as a retirement fund manager, and thus made it extremely difficult for him to generate income.  At the same time, he was forced to defend 30 actions against him and the pension plans he managed in both the U.S. and Europe.  Tew filed claims with three different liability insurers to assist with legal fees, but they denied the claims based on purported exceptions from coverage for alleged pension fund fraud.

64.     In addition, following the filing of the SKAT Actions, several of Tew's clients who had invested retirement funds in pension plans he managed sued Tew to recover their investments of more than $4.5 million, which Plaintiffs later discovered ED&F had stolen.

65.     Unable to pay attorneys' fees necessary to defend this onslaught of legal actions, Tew and his wife, Andrea, were forced to file for bankruptcy under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Eastern District of Kentucky (the "Bankruptcy Court") on July 23, 2020.  The Bankruptcy Court confirmed the Debtors' Second Amended Chapter 11 Plan of Reorganization on October 21, 2021.

-16-

66.     Fearing that counsel for Plaintiffs might withdraw from defending the SKAT Actions because of unpaid bills, Tew sought to settle the ongoing litigation.

67.     On June 7, 2021, Tew entered into a settlement agreement with SKAT for a total of $33,996,000 ("Settlement Agreement").  As part of the Settlement Agreement, Tew confessed to judgment and agreed that such confession could be filed to enforce the judgment if his bankruptcy proceedings were dismissed.  Tew also agreed to full and complete cooperation with SKAT to investigate third parties—such as ED&F—who were the true perpetrators of the alleged fraudulent withholding-tax scheme.

68.     The Settlement Agreement between SKAT and Tew made clear all parties' acknowledgment that the agreement "effects a settlement of claims some or all of which are denied and contested, and that nothing contained herein shall be construed as an admission of liability or wrongdoing."  The Settlement Agreement also explicitly noted that "one or more of the Tew Debtors asserts a right to recover against unrelated third parties for claims related to the dividend withholding tax refunds and other acts of negligence or intentional torts," and stated that other than the settled amount of $33,996,000, "SKAT shall have no right or entitlement to any sums recovered by the Tew Debtors from unrelated third parties."  Accordingly, the Settlement Agreement was not an admission of Plaintiffs' guilt and did not waive any claims Plaintiffs maintain against ED&F.

69.     Prior to settling the SKAT Actions, Plaintiffs had not reviewed documents produced by ED&F.  Following the settlement, however, and as part of their required cooperation with SKAT in further investigation of third parties, Plaintiffs were given access to documents produced by ED&F that revealed in part the extent of ED&F's wrongdoing.

**The Truth of ED&F's Corrupt and Criminal Enterprise is Revealed**

70.     The truth concerning ED&F's role in the dividend withholding-tax scheme began to emerge in late 2019.  First, on or around August 20, 2019, ED&F's European CEO, Stephen Hawksworth, resigned effective immediately.

71.     Just two weeks later, in September 2019, ED&F admitted in connection with a lawsuit brought by SKAT in the United Kingdom that it had failed to exercise "all due care and skill" in connection with its representations to SKAT in 80 tax vouchers, which it labeled "incorrect" because the pension plans specified on those vouchers "had not 'received' the amount set out therein by way of dividend from the Danish Listed Company; and had not 'suffered' [withholding tax] in the amount set out therein in relation to such dividend at the stated (27%) or any rate."

72.     In other words, for at least these 80 tax vouchers, ED&F falsely certified that the pension plans listed had received dividends net of withholding taxes, and then issued the vouchers to the payment processors knowing they would submit them to SKAT for reimbursement to those pension plans.

73.     Nine of the 80 tax vouchers listed as incorrect by ED&F in its filing in the U.K. had been issued on behalf of a pension plan managed by Tew, including one that was issued on behalf of Bluegrass.  They are identified in the table below:

| Pension Plan | Shareholding | Ex Date | Withheld Dividend Tax (DKK) | Withheld Dividend Tax Entitlement (DKK) | Amount of Overpayment by SKAT (DKK) |
|---|---|---|---|---|---|
| Bluegrass Investment Management LLC Retirement Plan | 4,248,000 TDC A/S | 7/3/2014 | 2,523,312.00 | 1,815,264.00 | 708,048.00 |
| Bluegrass Retirement Group Trust | 1,610,000 TDC A/S | 7/3/2014 | 956,340.00 | 716,958.00 | 239,382.00 |

| Autoparts Pensions Group Trust | 3,705,000 TDC A/S | 7/3/2014 | 2,200,771.00 | 1,525,037.00 | 675,734.00 |
|---|---|---|---|---|---|
| Casting Pensions Group Trust | 3,402,400 TDC A/S | 7/3/2014 | 2,021,025.60 | 1,543,628.00 | 477,398.00 |
| Central Technologies Pensions Group Trust | 1,570,000 TDC A/S | 7/3/2014 | 932,580.00 | 700,920.00 | 231,660.00 |
| Industrial Pensions Group Trust | 3,713,200 TDC A/S | 7/3/2014 | 2,205,640.80 | 1,515,947.00 | 689,693.00 |
| SV Holdings LLC Retirement Plan | 3,073,200 TDC A/S | 7/3/2014 | 1,825,480.80 | 1,131,332.00 | 694,148.00 |
| Tew Enterprises LLC Retirement Plan | 4,569,000 TDC A/S | 7/3/2014 | 2,713,986.00 | 2,040,390.00 | 673,596.00 |
| Tew LP Retirement Plan | 4,959,200 TDC A/S | 7/3/2014 | 2,945,764.80 | 1,989,425.00 | 956,340.00 |

74.     For each of these fraudulent transactions, ED&F pocketed the profits from the false tax withholdings by embezzling the funds from the respective plan's brokerage account.

75.     Further investigation has revealed that these nine tax vouchers are identical in appearance, format and language to the other tax vouchers issued on behalf of Tew-managed pension plans by ED&F.  ED&F did not explain whether and how the nine transactions differed from other similar transactions ED&F conducted on behalf of those plans.

76.     In fact, ED&F continued to maintain that the remainder of the tax vouchers it issued for Tew-managed pension plans were legitimate.  Indeed, just one month after making this filing in the U.K. action, ED&F's counsel sent letters to those plans informing them that ED&F would not agree to pay DAT for allegedly fraudulent tax claims, and that DAT would likely pursue the plans instead.  Therefore, the extent of ED&F's wrongdoing remained concealed from Plaintiffs.

77.     Only after Tew settled the SKAT actions and agreed to cooperate in the investigation of third parties in June 2021 were Plaintiffs given access to additional information procured by SKAT that showed in more detail the scope and breadth of ED&F's scheme.

78.     Documents produced by ED&F that Plaintiffs were made aware of after the settlement indicate that each of the transactions underlying the 80 tax vouchers about which ED&F admitted the listed plans did not receive a dividend and improperly claimed withholding-tax refunds—including the transaction on behalf of Bluegrass—involved circular, cum-ex trades through an ED&F-affiliated broker, Volcafe Ltd. ("Volcafe"), in which the pension plans purportedly purchased shares in a Danish company prior to the date a dividend would be issued from an ED&F affiliate called ED&F Man Proprietary Trading (Dubai) Limited ("ED&F Dubai") that did not have the shares and only obtained them by buying the shares from the pension plans (through ED&F) following the dividend date at a lower price.  In effect, neither ED&F nor the pension plans had the shares on the date the dividend was issued, and thus they were ineligible to receive refunds for withholding taxes.

79.     The documents further suggest that many other trades executed by ED&F on behalf of these pension plans during the Relevant Period followed a similar, circular trading pattern—the only difference being that the "seller" prior to the dividend was a third party not affiliated with ED&F.

80.     For example, documents show that certain brokers (some of which were affiliated with ED&F) were used by ED&F repeatedly to short-sell shares in Danish companies to the pension plans.  To cover their short positions, these brokers would have to procure a volume of shares well beyond the average daily trading volume of the shares.  The only plausible explanation for their ability to cover these positions is circular trades from the very same pension plans that purportedly purchased the shares prior to the dividend.  In these instances, as well, the pension plans did not actually obtain any shares in the Danish companies, and thus were ineligible to receive refunds for withholding taxes.

81.     Lastly, the documents demonstrate that because ED&F did not have sufficient shares on hand to settle many of its cum-ex trades on the settlement dates, ED&F broke down the shares into "shapes" that it would cycle through the same circular trade pattern—from ED&F to the seller then back to ED&F—multiple times.  ED&F, as an example, would use the same 5,000 shares for five settlement cycles to settle purchases of 25,000 shares by the pension plans, but ED&F would issue false tax vouchers stating that the plans owned the full 25,000 shares.

82.     Plaintiffs cannot identify without further discovery the number of transactions ED&F conducted on behalf of Bluegrass that followed this circular trading pattern, involved shapes of shares against which tax vouchers were already issued, or were fraudulent for some other reason, as ED&F fabricated the trading records they sent to Plaintiffs to give them the false impression that the trades in fact occurred and the dividends underlying the tax vouchers were received.

83.     Other subsequent events indicate that a high percentage (if not all) of ED&F's trading during the Relevant Period was fraudulent and part of its scheme.

84.     At least three countersuits against ED&F have been brought in the MDL alleging, like Plaintiffs, that pension fund managers who contracted with ED&F were misled to believe that ED&F was conducting legal dividend arbitrage trading on their behalf and were provided false documentation concerning transactions for which withholding tax refunds were submitted and obtained improperly.

85.     SKAT brought suit against ED&F in the U.K. High Court seeking approximately $2 billion for negligence in submitting false tax vouchers.  That claim was ultimately dismissed on a procedural technicality.

86.     In November 2022, ED&F's London office was raided by German and Danish investigators as part of a sprawling probe into cum-ex trading that purportedly defrauded those governments out of billions of dollars.  Homes of certain ED&F employees in the U.K. were also searched in connection with these investigations.

87.     On June 5, 2023, the FCA fined ED&F 17.2 million pounds for "serious failings which enabled million in illegitimate tax reclaims," representing the largest fine the FCA has issued in connection with cum-ex trading.  In a press release, the FCA said it had established that tax refunds of (at least) 20 million pounds were illegitimate and criticized ED&F for having "inadequate compliance checks" and failing to "take any steps to understand the trading activities or properly consider the risks of dividend arbitrage trading."

### Additional RICO Relevant Facts

88.     Throughout the Relevant Period, ED&F created fabricated documents reflecting trading records in the Bluegrass brokerage account that ED&F sent to Tew by email.

89.     Throughout the Relevant Period, ED&F created false tax vouchers that it submitted by email to Global Equities with the intent that Global Equities would attach the vouchers to applications for withholding tax refunds from tax authorities in Denmark, the Netherlands, Belgium, and Finland, among other countries.

90.     On information and belief, by fabricating documents and concealing ED&F's illegal cum-ex trading, ED&F was able to maintain its control over the corrupt and criminal enterprise that defrauded Plaintiffs and various European governments.

91.     The funds embezzled by ED&F included funds of employee pension benefit plans that Tew had been managing, including the Roth 401(k) accounts held within Bluegrass.

92.     On information and belief, the funds fraudulently obtained from ED&F's cum-ex trading (and ultimately embezzled from Bluegrass) were used to perpetuate ED&F's scheme by expanding its ability to solicit new U.S. pension plans and conduct the same patterns of illicit cum-ex trading.

93.     ED&F repeatedly defrauded U.S. pension plans through its operation of the cum-ex trading scheme, including at least four pension plans that have brought third-party complaints against ED&F in the MDL—Newsong Fellowship Church 401(K) Plan, Del Mar Asset Management Savings and Retirement Plan, Federated Logistics LLC 401K Plan, and Goldstein Law Group PC 401(K) Profit Sharing Plan.

94.     These lawsuits reveal a repeated course of conduct, with plaintiffs in more than one case alleging that ED&F committed similar fraudulent acts as those in this action, including providing them with falsified trading records and creating false tax vouchers.

## Equitable Tolling

95.     ED&F fraudulently concealed its illegal scheme from Plaintiffs by providing falsified documentation throughout the Relevant Period that made it appear to Plaintiffs as if ED&F was conducting legitimate dividend arbitrage trading and that Plaintiffs were entitled to profits from the tax refunds ED&F obtained.

96.     ED&F had a contractual and fiduciary duty to disclose to Plaintiffs that it was engaged in illegal trading and submitting false tax vouchers to foreign governments on Bluegrass' behalf.  ED&F's failure to disclose those facts further obstructed Plaintiffs from learning about ED&F's illicit scheme.

97.     The filing of the SKAT Actions put ED&F, not Plaintiffs, on notice of these claims. Still, ED&F did not come forward to disclose their role in the scheme and allowed Plaintiffs to take the fall.

98.     Plaintiffs remained unaware until the information was provided to them following Tew's settlement of the SKAT Actions in June 2021 that ED&F's illegal trading had resulted in the submission of false tax vouchers.

99.     ED&F also fraudulently concealed that it had embezzled the funds from the Bluegrass primary brokerage account by representing (through Arunvill) that upon the closing of the account, the funds would be transferred to an ED&F omnibus account that would ultimately distribute the funds back to Bluegrass.

100.    ED&F had a contractual and fiduciary duty to disclose to Plaintiffs that if they were to close the Bluegrass prime brokerage account, Bluegrass' funds would be confiscated by ED&F and become unavailable to it.  ED&F's failure to disclose those facts further obstructed Plaintiffs from learning about ED&F's embezzlement.

101.    Plaintiffs remained unaware until after ED&F's counsel notified Plaintiffs that the Bluegrass prime brokerage account had been closed with zero funds, and ED&F and its counsel refused to provide Plaintiffs with further information or return their money, that ED&F had embezzled Bluegrass' funds.

**CLAIMS**

**COUNT I**
**RICO § 1962(c)**

102.    The allegations above are incorporated herein by reference.

103.    ED&F, ED&F Dubai, Volcafe, and other ED&F-affiliated or third-party entities or brokers involved in cum-ex trading with ED&F are an association in fact and together constitute

an enterprise engaged in and whose activities affect interstate commerce.  ED&F is associated with the enterprise and, on information and belief, is the mastermind behind it.

104.    ED&F agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiffs.  Specifically, ED&F facilitated illegal cum-ex trading via its affiliated entities or brokers, including ED&F Dubai and Volcafe, or third-party entities or brokers; knowingly submitted false tax vouchers to foreign tax authorities which claimed that Bluegrass held shares it did not own and had taxes withheld on dividends it never received; and sent fabricated documentation to Plaintiffs that indicated that legal dividend arbitrage trades had been completed and legitimate profits were generated.

105.    Pursuant to and in furtherance of its fraudulent scheme, ED&F committed multiple related acts of wire fraud, including sending false tax vouchers, trading ledgers, and account statements by email.

106.    As part of the scheme, ED&F also embezzled funds from pension plans managed by Tew, including Bluegrass, which included moneys from employee pension benefit plans and constitutes a violation of 18 U.S.C. § 664.

107.    The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

108.    ED&F has directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

109.    As a direct and proximate result of ED&F's racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property because they

lost their funds in Bluegrass, including their original investment of $29,262,594 million and all profits they would have received absent ED&F's violations, and because they were forced to agree to pay $33,996,000 to settle the actions brought by SKAT for losses caused by ED&F's violations.

## COUNT II
## RICO § 1962(a)

110.    The allegations above are incorporated herein by reference.

111.    ED&F, ED&F Dubai, Volcafe, and other ED&F-affiliated or third-party entities or brokers are an association in fact and together constitute an enterprise engaged in and whose activities affect interstate commerce.

112.    ED&F used and invested income that was derived from a pattern of racketeering activity in an interstate enterprise.  Specifically, on information and belief, ED&F used some of the money fraudulently taken from Plaintiffs to solicit other U.S. pension plans to engage in the same pattern of illegal cum-ex trading.

113.    The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

114.    As a direct and proximate result of ED&F's racketeering activities and violations of 18 U.S.C. § 1962(a), Plaintiffs have been injured in their business and property because they lost their funds in Bluegrass, including their original investment of $29,262,594 million and all profits they would have received absent ED&F's violations, and because they were forced to agree to pay $33,996,000 to settle the actions brought by SKAT for losses caused by ED&F's violations.

## COUNT III
## RICO § 1962(b)

115.    The allegations above are incorporated herein by reference.

116.    ED&F, ED&F Dubai, Volcafe, and other ED&F-affiliated or third-party entities or brokers are an association in fact and together constitute an enterprise engaged in and whose activities affect interstate commerce.

117.    ED&F maintained interests in and control of the enterprise through a pattern of racketeering activity.  Specifically, ED&F maintained its interest in and control of the enterprise by intentionally providing fabricated documents to Plaintiffs and the tax authorities.

118.    The racketeering activity listed above constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

119.    ED&F has directly and indirectly maintained its interest in and control of the enterprise through the pattern of racketeering activity described above, in violation of 18 U.S.C. § 1962(b).

120.    As a direct and proximate result of ED&F's racketeering activities and violations of 18 U.S.C. § 1962(b), Plaintiffs have been injured in their business and property because they lost their funds in Bluegrass, including their original investment of $29,262,594 million and all profits they would have received absent ED&F's violations, and because they were forced to agree to pay $33,996,000 to settle the actions brought by SKAT for losses caused by ED&F's violations.

**COUNT IV**
**RICO § 1962(d)**

121.    The allegations above are incorporated herein by reference.

122.    As set forth above, ED&F agreed and conspired with ED&F Dubai, Volcafe, and other ED&F-affiliated or third-party entities or brokers to violate 18 U.S.C. §§ 1962(a), (b) and (c).

123.    ED&F intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in an interstate enterprise, maintain

interests in the enterprise through a pattern of racketeering activity, and conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity. ED&F knew that its predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(a), (b) and (c), in violation of 18 U.S.C. § 1962(d).

124.    As a direct and proximate result of ED&F's conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property because they lost their funds in Bluegrass, including their original investment of $29,262,594 million and all profits they would have received absent ED&F's violations, and because they were forced to agree to pay $33,996,000 to settle the actions brought by SKAT for losses caused by ED&F's violations.

## COUNT V
## COMMON LAW FRAUD

125.    The allegations above are incorporated herein by reference.

126.    ED&F materially misrepresented that tax vouchers were submitted for taxes (a) Bluegrass actually paid to foreign tax authorities, (b) on dividends Bluegrass actually received, (c) on shares Bluegrass actually owned, and (d) on the dates those dividends were paid.

127.    ED&F made these material misstatements and omissions in the tax vouchers themselves and in the documentation reflecting trade records that was provided to Plaintiffs.

128.    ED&F made these misstatements and omissions with knowledge of their falsity, or with reckless disregard of their falsity.

129.    Plaintiffs reasonably relied on such misrepresentations to claim tax-withholding refunds from various foreign governments, including Denmark, the Netherlands, and others, and to allow ED&F to continue to trade on behalf of Bluegrass.

130.    ED&F is liable to Plaintiffs for all costs they incurred or will incur as a result of claims by SKAT, DAT, or other foreign tax authorities concerning refunds claimed by Plaintiffs on the basis of fraudulent tax vouchers issued by ED&F, including, but not limited to, the $33,996,000 Plaintiffs agreed to pay to settle the actions brought by SKAT, as well as punitive damages, plus interest.

**COUNT VI**
**NEGLIGENT MISREPRESENTATION**

131.    The allegations above are incorporated herein by reference.

132.    ED&F had a duty to provide truthful and accurate tax vouchers and other documentation for Plaintiffs.

133.    ED&F negligently misrepresented that tax vouchers were submitted for taxes (a) Bluegrass actually paid to foreign tax authorities, (b) on dividends Bluegrass actually received, (c) on shares Bluegrass actually owned, and (d) on the dates those dividends were paid.

134.    ED&F made these material misstatements and omissions in the tax vouchers themselves and in the documentation reflecting trade records that was provided to Plaintiffs.

135.    ED&F knew, or reasonably should have known, that the information provided in these documents was false.

136.    Plaintiffs reasonably relied on such misrepresentations to claim tax withholding refunds from various foreign governments, including Denmark, the Netherlands, and others, and to allow ED&F to continue to trade on behalf of Bluegrass.

137.    ED&F is liable to Plaintiffs for all costs they incurred or will incur as a result of claims by SKAT, DAT, or other foreign tax authorities concerning refunds claimed by Plaintiffs on the basis of fraudulent tax vouchers issued by ED&F, including, but not limited to, the

$33,996,000 Plaintiffs agreed to pay to settle the actions brought by SKAT, as well as punitive damages, plus interest.

## COUNT VII
## <u>BREACH OF CONTRACT</u>

138.    The allegations above are incorporated herein by reference.

139.    The Agreements between Bluegrass and ED&F constitute binding and enforceable contracts.

140.    Bluegrass performed its obligations under the Agreements throughout the Relevant Period.

141.    ED&F's contractual obligations required it to use "all reasonable care"  and "comply in all material respects with all applicable laws" in performing its obligations under the Agreements, including buying or selling securities for Bluegrass, keeping records and statements concerning Bluegrass' securities, and crediting all income, dividends, and proceeds on Bluegrass' securities only after actual receipt and reconciliation.

142.    ED&F's contractual obligations prohibited it from, among other things, falsifying account statements, tax vouchers, or other documentation relevant to the Bluegrass brokerage account.

143.    ED&F breached the Agreements when it failed to engage in legal dividend arbitrage trading on behalf of Bluegrass.

144.    ED&F also breached the Agreements when it falsified account statements, tax vouchers, and trading ledgers relevant to the Bluegrass brokerage account.

145.    ED&F is liable to Plaintiffs for restitution, lost profits, and all costs they incurred or may incur as a result of claims by SKAT, DAT, or other foreign tax authorities concerning refunds claimed by Plaintiffs on the basis of fraudulent tax vouchers issued by ED&F, including, but not limited to, the $33,996,000 Plaintiffs agreed to pay to settle the actions brought by SKAT, as well as punitive damages, plus interest.

**COUNT VIII**
**BREACH OF FIDUCIARY DUTY**

146.    The allegations above are incorporated herein by reference.

147.    As broker-custodian for Bluegrass, ED&F had a fiduciary relationship with Plaintiffs.  Plaintiffs relied on ED&F to exercise due care, act for the benefit of Bluegrass, and deal truthfully with them, and ED&F was required to do so.

148.    ED&F's fiduciary duties are separate and distinct from its contractual obligations under the Agreements.

149.    Throughout the Relevant Period, ED&F had control over the Bluegrass brokerage account, including its securities trading and receipt of dividend withholding taxes.

150.    ED&F breached its fiduciary duties when it falsified account statements, tax vouchers, and trading ledgers relevant to the Bluegrass brokerage account.

151.    ED&F is liable to Plaintiffs for all costs they incurred or may incur as a result of claims by SKAT, DAT, or other foreign tax authorities concerning refunds claimed by Plaintiffs on the basis of fraudulent tax vouchers issued by ED&F, including, but not limited to, the $33,996,000 Plaintiffs agreed to pay to settle the actions brought by SKAT, as well as punitive damages, plus interest.

**COUNT IX**
**CONVERSION**

152.    The allegations above are incorporated herein by reference.

153.    Plaintiffs had legal title to the funds in the Bluegrass brokerage account as of the time that account was closed in January 2015.

154.    Plaintiffs had the right to possess the funds in the Bluegrass brokerage account at the time the account was closed in January 2015.

155. ED&F withheld the funds in the Bluegrass brokerage account beginning in January 2015, thus exercising dominion over the funds in the account.

156. On information and belief, ED&F withheld the funds from the Bluegrass brokerage account for its own beneficial enjoyment.

157. Defendant Tew made multiple demands for the funds beginning in July 2015, which ED&F ignored and thus refused.

158. ED&F's refusal to return the funds to Plaintiffs caused Plaintiffs to lose nearly all funds in the Bluegrass account, which together totaled at least $72,009,431, and include Plaintiffs' original investment of $29,262,594.

159. ED&F is liable to Plaintiffs for the fair market value of Bluegrass' funds at the time of conversion, as well as punitive damages, plus interest.

**COUNT X**
**UNJUST ENRICHMENT**

160. The allegations above are incorporated herein by reference.

161. ED&F collected all proceeds from any successful tax application for withholding-tax refunds based on a tax voucher issued by ED&F on behalf of Bluegrass.

162. On information and belief, ED&F still possesses some or all of the profits it collected from Bluegrass.

163. ED&F has admitted that certain of the tax vouchers it issued in connection with applications for withholding tax refunds submitted by Bluegrass were false.

164. SKAT and other foreign tax authorities have alleged that many more of the tax vouchers issued in connection with applications for withholding tax refunds submitted by Bluegrass were false and that they are entitled to reimbursement to some or all of the amounts that they paid for those refunds.

165. It would be unjust for ED&F to retain the profits it collected in connection with Bluegrass' transactions and withholding-tax refunds if the underlying tax vouchers are false as admitted by ED&F or alleged by the tax authorities.

166.     ED&F is liable to account for and return all profits collected from Bluegrass on the basis of underlying tax vouchers that were false, plus interest.

### COUNT XI
### EQUITABLE INDEMNITY

167.     The allegations above are incorporated herein by reference.

168.     Plaintiffs were forced to agree to settle with SKAT for $33,996,000 based on allegations that tax vouchers issued in connection with applications for withholding-tax refunds submitted by Bluegrass and other pension plans were false.

169.     Other tax authorities have made similar allegations, though they have not formally brought suit against Plaintiffs.

170.     Plaintiffs relied on ED&F's misrepresentations to claim withholding-tax refunds, and it was ED&F that provided the false statements representing that Bluegrass owned shares in foreign companies and had earned dividends on those shares.

171.     ED&F should be obligated to indemnify Plaintiffs for all costs they have incurred or may incur as a result of claims by SKAT, DAT, or other foreign tax authorities concerning refunds claimed by Plaintiffs on the basis of fraudulent tax vouchers issued by ED&F, including, but not limited to, the $33,996,000 Plaintiffs agreed to pay to settle the actions brought by SKAT, plus interest.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs request that this Court:

A.      Enter a judgment in favor of Plaintiffs awarding them damages against Defendant ED&F for actual damages, punitive damages, treble damages (with respect to those counts brought under RICO), pre-judgment and post-judgement interest, and attorney's fees and costs; and

B.      Grant Plaintiffs any other relief this Court may find just and proper.

## **JURY TRIAL DEMAND**

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiffs hereby demand a trial by jury on all issues triable of right by a jury.


Respectfully submitted,


/s/ Michael J. Gartland
Michael J. Gartland, Esq.
DelCotto Law Group PLLC
200 North Upper Street
Lexington, KY 40507
Tel: (859) 251-7159
Email: mgartland@dlgfirm.com
ATTORNEY FOR PLAINTIFFS

-and-

Richard A. Bodnar, Esq. (*pro hac vice* application forthcoming)
Jeffrey A. Ritholtz, Esq. (*pro hac vice* application forthcoming)
Rolnick Kramer Sadighi LLP
1251 Avenue of the Americas
New York, NY 10020
Tel: (212) 597-2800
Email: rbodnar@rksllp.com
Email: jritholtz@rksllp.com
OF COUNSEL