UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

BERNARD TEW, *et al.*,           )
                                 )
        Plaintiffs,              )        Civil No. 5:23-cv-00345-GFVT
                                 )
v.                               )
                                 )        **OPINION**
MCML LTD.,                       )        **&**
                                 )        **ORDER**
        Defendant.              )
                                 )

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Mr. Tew asserts that he was swindled out of $70 million in a "diabolical" fraud perpetrated by the custodian of his brokerage account. The complex, international scheme allegedly victimized over 270 United States pension plans while implicating the enforcement authority of Germany, Denmark, Belgium, Finland, the Netherlands, and the United Kingdom.

As a result of the fraudulent practices associated with his account, Tew found himself defending a $39 million lawsuit filed by the Swedish tax authority in the Southern District of New York. He subsequently filed for Chapter 11 Bankruptcy and instituted an adversary proceeding against the fraudster in bankruptcy court. Today, Mr. Tew is back in federal court. For the reasons that follow, the Defendant's Motion to Dismiss **[R. 8]** is **GRANTED IN PART** and **DENIED IN PART.**

**I**

Plaintiff Bernard Tew is a resident of Kentucky and the trustee of Plaintiff Bluegrass Retirement Group Trust (a pension plan).[1]  [R. 1 at 5.]  Beginning in 2012, Tew contracted with Defendant MCML (f/k/a ED&F) to conduct "dividend arbitrage trading" in Europe on the Plaintiffs' behalf.  *Id.* at 3.  Tew also hired Arunvill Capital UK to manage his investments; he generally communicated with ED&F (a London firm) through Arunvill.  *Id.* at 10.  Between 2012 and 2015, ED&F allegedly embezzled over $70 million from Bluegrass Trust through a fraudulent tax practice known as "cum-ex" trading.  *Id.* at 13–14.

In particular, Plaintiffs state that ED&F used Bluegrass "as a conduit to conduct [] fraudulent transactions[.]"  *Id.* at 4.  Those transactions worked like this: ED&F used a third-party broker to conduct "circular" trades.  *Id.* at 20.  Specifically, "[Bluegrass Trust] purportedly purchased shares [] prior to the date a dividend would be issued from an ED&F affiliate . . . that did not have the shares and only obtained them by buying the shares from the [Bluegrass Trust] (through ED&F) following the dividend date at a lower price."  *Id.*  "In effect, neither ED&F nor [Bluegrass Trust] had the shares on the date the dividend was issued, and thus they were ineligible to receive refunds for withholding taxes."  *Id.*

Nonetheless, ED&F allegedly filed fraudulent tax vouchers with foreign governments on Plaintiffs' behalf.  *Id.* at 5, 11, 18.  Tew states that he never saw these vouchers.  *Id.* at 12. Instead, ED&F "submitted the vouchers directly to . . . a third party payment-processing agent, which submitted the applications for refunds directly to the foreign tax authorities."  *Id.*  Then,

---

[1] The facts recounted here are taken from the Plaintiffs' Complaint.  [R. 1.]  When reviewing the 12(b)(6) portion of the Defendant's Motion, the Court presumes the Complaint's truth while making reasonable inferences in the Plaintiffs' favor.

the third party "would [] pay ED&F for all refunds received from the tax authorities, and ED&F would distribute Bluegrass' portion of the profits to its prime brokerage account." *Id.*

Throughout this period, Tew states that ED&F routinely sent doctored trading ledgers and account statements to Tew's email. *Id.* at 10, 21. These counterfeit statements were apparently intended "to give [Plaintiffs] the false impression that the trades in fact occurred and the dividends underlying the tax vouchers were received." *Id.* This state of affairs continued for several years.

Finally, in 2015, Tew attempted to access the funds in the Bluegrass account. *Id.* at 13. He reached out to Arunvill and ED&F; but despite repeated attempts, they could not be reached. *Id.* at 14. Arunvill had "seemingly dissolved," and "ED&F refused to engage with Tew directly." *Id.* Apparently quite perturbed, "Tew considered traveling to London to confront ED&F in person[.]" *Id.* However, he "was unable to do so in light of his financial constraints." *Id.* Later, he discovered that the Bluegrass account "had been closed in January 2015 with a balance of zero." *Id.*

In 2018, the Danish tax authority (SKAT) began to crack down on "cum-ex" trading. SKAT sued Tew and Bluegrass for $39 million in a multidistrict litigation (MDL) action involving myriad other pension plans. *Id.* at 15; *see In re Customs & Tax Admin. of Kingdom of Den. (Skatteforvaltningen) Tax Refund Scheme Litig.*, No. 1:18-md-02865-LAK (S.D.N.Y. Oct. 9, 2018). Tew settled for around $34 million. [R. 1 at 17.] Then, "following the filing of the SKAT Actions, several of Tew's clients who had invested retirement funds in pension plans he managed sued Tew to recover their investments of more than $4.5 million, which Plaintiffs later discovered ED&F had stolen." *Id.* at 16. Ultimately, Tew "was forced to defend 30 actions against him and the pension plans he managed in both the U.S. and Europe." *Id.* These suits

"severely damaged Tew's reputation as a retirement fund manager, and thus made it extremely difficult for him to generate income." *Id.* "Unable to pay [his] attorneys' fees," Tew filed for Chapter 11 bankruptcy in 2020. *Id.*

In the intervening years, the magnitude of ED&F's fraud was revealed: apparently, ED&F had used almost 300 United States pension plans to conduct its fraudulent tax scheme. *Id.* at 4. Tew later learned that "Bluegrass was necessary for ED&F to carry out its scheme because, under tax treaties between the U.S. and various European countries, U.S. pension plans are exempt from taxes on dividend payments that are otherwise withheld by the European tax authorities." *Id.* at 2. Thus, "ED&F [] targeted U.S. pension plans (including Bluegrass) so that it could pretend to execute a legal 'dividend arbitrage strategy' on its behalf and share the profits from tax refunds obtained from the European tax authorities with the U.S. plan." *Id.* at 3.

The fallout continued: ED&F was also sued by SKAT. *Id.* at 21. Then, its London offices were raided in 2022 by German and Danish investigators "as part of a sprawling probe into cum-ex trading that purportedly defrauded those governments out of billions of dollars." *Id.* at 22. Finally, in 2023, ED&F incurred a 17.2 million pound fine from the United Kingdom's financial regulatory body. *Id.*

Mr. Tew maintains that he did not know of his alleged injury until 2021. He chalks that delay up to a few things. First, he emphasizes that ED&F maintained its innocence as to all or some of the allegations. *Id.* at 19. Next, he notes that ED&F "fraudulently concealed that it had embezzled the funds from the Bluegrass primary brokerage account by representing (through Arunvill) that upon the closing of the account, the funds would be transferred to an ED&F omnibus account that would ultimately distribute the funds back to Bluegrass." *Id.* at 24. Further, he explains that "only after Tew settled the SKAT actions and agreed to cooperate in the

investigation of third parties in June 2021 were Plaintiffs given access to additional information procured by SKAT that showed in more detail the scope and breadth of ED&F's scheme." *Id.* at 19.

Mr. Tew and Bluegrass filed the instant Complaint against ED&F in December 2023. [R. 1.] Now, ED&F moves to dismiss for, inter alia, want of jurisdiction and failure to state a claim. [R. 8.] During a Motion Hearing, the Court considered arguments from both parties. [R. 29.]

## II

Federal Rule of Civil Procedure 12(b)(1) provides that a defendant may assert lack of subject-matter jurisdiction as a defense. A motion to dismiss under Rule 12(b)(1) challenges the Court's power to hear the case before it. When jurisdiction is challenged under this rule, the burden is on the plaintiff to prove that jurisdiction exists. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996).

Further, a Motion to Dismiss under 12(b)(2) challenges a court's ability to exercise jurisdiction over a defendant. The decision as to whether a forum may preside over a particular defendant "is not an idle or perfunctory inquiry; due process demands that parties have sufficient contacts with the forum state so that it is fair to subject them to jurisdiction." *Conn v. Zakharov*, 667 F.3d 705, 711 (6th Cir. 2012) (citing *Burger King Corp v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

Finally, a motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the plaintiffs' complaint. Fed. R. Civ. P. 12(b)(6). In reviewing a Rule 12(b)(6) motion, a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). However, a court "'need not accept as true legal conclusions or

unwarranted factual inferences.'" *Id.* (quoting *Gregory v. Shelby Cnty.*, 220 F.3d 433, 446 (6th Cir. 2000)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In other words, "[t]he factual allegations, assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (emphasis in original) (citing *Twombly*, 550 U.S. at 555).

ED&F presents a litany of arguments in favor of dismissal. Two of these arguments (personal jurisdiction and standing) present threshold issues that must be resolved at the outset. Because ED&F's standing argument touches on a non-waivable issue of the Court's subject matter jurisdiction, and because standing is a "threshold inquiry in every federal case," the Court begins with standing. *Pleasant View Baptist Church v. Saddler*, 506 F. Supp. 3d 510, 516 (E.D. Ky. 2020).

**A**

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (internal quotation marks and citation omitted). "The doctrine of [Article III] standing aids us in defining these limits." *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017). To establish standing, a plaintiff must show that "(1) he has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent rather than conjectural or hypothetical; (2) that there is a causal connection between the injury and the defendant's alleged wrongdoing; and (3) that the injury can likely be

redressed." *Levy*, 854 F.3d at 857. Courts assessing standing "look only to 'the facts existing

when the complaint is filed.'" *Barber v. Charter Twp. of Springfield*, 31 F.4th 382, 390 (6th Cir.

2022) (quoting *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 569 n.4 (1992)).

ED&F presents several arguments in support of its conclusion that the Plaintiffs lack an

injury in fact. [R. 8-1 at 21–24.] First, it states that the allegedly stolen funds belonged to

Bluegrass (not Tew); therefore Tew has not been injured. *Id.* Second, it emphasizes that Tew

never paid the SKAT settlement amount (considered an allowed claim in bankruptcy). *Id.*

Third, it queries how Plaintiffs could have incurred $70 million in damages when (1) $30 million

of that amount was invested for the purposes of offsetting a loan from ED&F; and (2) money that

routinely flowed in and out of the account during trading did not necessarily belong to the

Plaintiffs. *Id.* The Court is not persuaded by any of these arguments.

First, Tew alleges an injury. He states that he invested money into the account, and that

those funds were then stolen by ED&F. He also alleges serious harm to his reputation and

career. Second, although Tew has not yet paid any of the SKAT settlement (deemed an allowed,

unsecured claim by the bankruptcy court), he alleges that the various lawsuits contributed to his

bankruptcy filing in the first place. And he identifies the Defendant's conduct as the cause of

those suits. Third, Plaintiffs don't need to plead a specific amount to satisfy Article III. *See*

*Total Quality Logistics, LLC v. EDA Logistics*, No. 1:21-CV-164, 2021 WL 1964699, at *5 (S.D.

Ohio May 17, 2021) ("Certainly, there is no requirement under federal law to plead any

particular or specific amount of damages."). And as Plaintiffs appropriately point out, they may

struggle to ascertain the exact sum that was unlawfully retained before discovery. *Waterfront*

*Petroleum Terminal Co. v. Detroit Bulk Storage, Inc.*, 574 F. Supp. 3d 473, 479 n.4 (E.D. Mich.

2021) ("[Even] an overbroad claim for damages is something that should be addressed in a motion for summary judgment and not as an issue of Article III standing.")[2].

Finally, Plaintiffs allege that ED&F's fraud caused their injuries, and that their injuries would be redressable by a monetary award against ED&F.  Having found standing, the Court is satisfied that it has the power to hear the case.  But its jurisdictional inquiry doesn't end there: next, it must consider whether it has personal jurisdiction over ED&F.

### B

"The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'"  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)).  Moreover, "[a] federal court . . . may not exercise jurisdiction over a defendant unless courts of the forum state would be authorized to do so by state law—and any such exercise of jurisdiction must be compatible with the due process requirements of the United States Constitution."  *Conn v. Zakharov*, 667 F.3d 705, 711 (6th Cir. 2012).

Ordinarily, the plaintiff bears the burden of establishing personal jurisdiction by a preponderance.  *Id.*  "But where, as here, the defendant has moved to dismiss the case under Rule 12(b)(2) for lack of personal jurisdiction and the district court rules on the motion without an evidentiary hearing, the plaintiff need only make a 'prima facie' case that the court has personal jurisdiction."  *Id.*; *see also Air Prods. & Controls, Inc. v. Safetech Intern., Inc.*, 503 F.3d 544,

---

[2] Everyone appears to stipulate that Tew is the real party in interest for the claims asserted by Bluegrass.  During the Motion hearing in this matter, Plaintiffs' counsel agreed that Bluegrass's claims are more properly asserted by Tew as trustee.  Accordingly, that additional issue raised by the Defendants Motion appears to have been resolved by the agreement of the parties.

549 (6th Cir. 2007); *Kroger Co. v. Malease Foods Corp.*, 437 F.3d 506, 510 (6th Cir. 2006).  In

such cases, a court "do[es] not weigh the facts disputed by the parties but instead consider[s] the

pleadings in the light most favorable to the plaintiff[.]"  *Id.*  However, the court may take into

account "defendant's undisputed factual assertions."  *Id.*

 Courts adjudicating a 12(b)(2) challenge must first determine whether the forum state's

long-arm statute authorizes jurisdiction.  *Mich. Coal. of Radioactive Material Users, Inc. v.

Griepentrog*, 954 F.2d 1174, 1176 (6th Cir. 1992); *see Bird v. Parsons*, 289 F.3d 865, 871 (6th

Cir. 2002); *see also Cmty. Trust Bancorp, Inc. v. Cmty. Tr. Fin. Corp.*, 692 F.3d 469, 471 (6th

Cir. 2012) (quoting *Bird*, 289 F.3d at 871).  If it does, the court next assesses whether the

exercise of jurisdiction is consistent with due process.  *Bird*, 289 F.3d at 871; *Air Prods. &

Controls, Inc.*, 503 F.3d at 550.

 The Kentucky Supreme Court has rejected the notion that the state's long-arm statute is

"*per se* coextensive with the limits of federal due process".  *Barker v. Patrick Collins, Inc.*, No.

3:12CV–372–S, 2013 WL 3790904 (W.D. Ky. July 19, 2013) (citing *Caesars Riverboat Casino,

LLC v. Beach*, 336 S.W.3d 51, 55, 57 (Ky. 2011)).  Moreover, a court should proceed to the due

process analysis only once it has concluded that the defendant's activities fit into one of the

categories listed in Kentucky Revised Statute § 454.210.  *See Caesars Riverboat Casino*, 336

S.W.3d at 57 ("[T]he statute operates independently of federal due process analysis. Thus, we

clarify that proper deference to the language of the statute compels that, as an initial step, review

is necessary to determine whether long-arm jurisdiction over a foreign defendant is permissible

under KRS 454.210."); *see, e.g.*, *Reid v. Tenant Tracker, Inc.*, 685 F. Supp. 3d 465, 472 (W.D.

Ky. 2023) (declining to collapse the two-part inquiry).

1

First, the Court is satisfied that Kentucky's long-arm statute authorizes jurisdiction over ED&F.  The statute in effect at the time of filing provides that "[a] court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a claim arising from the person's [] [t]ransacting any business in this Commonwealth[.]"  Ky. Rev. Stat. Ann. § 454.210(2)(a); *see also Reid*, 685 F. Supp. 3d at 472.  The statute's "arising from" component demands "a reasonable and direct nexus between the wrongful acts alleged in the complaint and the statutory predicate for long-arm-jurisdiction."  *Caesars Riverboat Casino*, 336 S.W.3d at 59.  Although "Kentucky [] recently amended its long-arm statute . . . that amendment does not appear to be retroactive.  After all, it doesn't say that it is."  *Bell v. Kokosing Indus., Inc.*, No. 23-5791, 2024 WL 3549581, at *5 (6th Cir. July 26, 2024).  "Accordingly, [the Court] appl[ies] the long-arm statute that was in effect at the time of filing[.]"  *Id.*

Plaintiffs urge the propriety of long arm jurisdiction on the grounds that ED&F "transact[ed] any business" in Kentucky.  They emphasize that ED&F withdrew funds from a Kentucky bank account, contracted with the Kentucky Plaintiff, and directed "a consistent stream" of fraudulent, business-related emails into Kentucky (via Tew's email address). [3]  [R. 19 at 15.]  ED&F disagrees, instead contending that simply contracting with a Kentuckian does not amount to "transact[ing] any business" in Kentucky.  *See Net Clicks, LLC v. LKQ Corp.*, No. CV 21-143-DLB-CJS, 2022 WL 3654860, at *3 (E.D. Ky. Aug. 24, 2022) ("Merely entering into a contract with a Kentucky-based business does not amount to 'transacting any business' under the

---

[3] The Plaintiffs also note that, in an unrelated case in the SKAT MDL, Judge Kaplan found that he had personal jurisdiction over third-party defendant ED&F.  There, ED&F withdrew money from a New York brokerage account, used that money in a manner injurious to the New York account holder, returned money to the New York account, and charged the New York account holder for its work.  *In re Customs & Tax Admin. of the Kingdom of Denmark (SKAT) Tax Refund Litig.*, No. 18-CV-5053 (LAK), 2020 WL 70938, at *1 (S.D.N.Y. Jan. 7, 2020).

Kentucky long-arm statute."); *Valvoline, LLC v. Harding Racing, LLC*, No. 5:20-CV-00168-GFVT, 2021 WL 356895, at *5 (E.D. Ky. Feb. 2, 2021) (contract with a Kentuckian did not give rise to long-arm jurisdiction when the agreement was negotiated remotely and intended to be performed out of state).

ED&F's argument is legally correct, but factually unavailing.  ED&F did more than just contract with a Kentuckian.  It also allegedly withdrew funds in the Commonwealth and directed three years' worth of fraudulent, business-related communication into the Commonwealth (via Tew's email).  [R. 1-1 (Example Email)]; *see also* [R. 8-2 (Custody Agreement); R. 8-3 (Master Agreement)[4]]; *See, e.g.*, *Hall v. Rag-O-Rama, LLC*, 359 F. Supp. 3d 499, 506 (E.D. Ky. 2019) ("The Sixth Circuit has held that the [long arm statute's] 'use of the word *any* . . . establishes that even the slightest transaction is sufficient to bring a corporation within [the forum's] long-arm jurisdiction.'").

Further, those allegedly fraudulent emails are not merely tangential: there is a reasonable and direct nexus between the emails and the allegations in the Complaint.  *See Eat More Wings, LLC v. Home Mkt. Foods, Inc.*, 282 F. Supp. 3d 965, 969–70 (E.D. Ky. 2017) ("Making phone calls, sending facsimiles, sending e-mails, letters or other communications, standing alone, 'may be sufficient to confer jurisdiction on the foreign defendant where the phone calls and faxes form the bases for the action.'") (quoting *Rice v. Karsch*, 154 F. App'x 454, 460 (6th Cir. 2005))).  There's also a nexus between ED&F's withdrawals and the wrongdoing alleged in the Complaint: Plaintiffs allege that the funds withdrawn from the Kentucky account were then used to perpetrate the fraud and embezzlement that is at the heart of this action.  For all these reasons,

---

[4] *See Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999) (explaining that a document attached to a defendant's motion to dismiss may be considered on 12(b)(6) review "when [it is] referred to in the complaint and [] central to the plaintiff's claim[.]").

the Court finds that the long arm statute is satisfied on the basis that ED&F transacted any

business in Kentucky.

**2**

Second, personal jurisdiction is consistent with constitutional standards.  A due process

analysis for specific personal jurisdiction follows a three-part test:

> First, the defendant must purposefully avail himself of the privilege of acting in
> the forum state or causing a consequence in the forum state.  Second, the cause of
> action must arise from the defendant's activities there.  Finally, the acts of the
> defendant or consequences caused by the defendant must have a substantial
> enough connection with the forum state to make the exercise of jurisdiction over
> the defendant reasonable.

*Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 550 (6th Cir. 2007) (quoting *S.*

*Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)).

**a**

First, ED&F's conduct amounts to purposeful availment.  That requirement "ensures that

a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous' or

'attenuated' contacts or of the 'unilateral activity of another party or third person.'"  *Air Prods. &*

*Controls, Inc.*, 503 F.3d at 551 (quoting *Burger King Corp.*, 471 U.S. at 475).  "Jurisdiction is

proper, however, where the contacts proximately result from actions by the defendant *himself*

that create a 'substantial connection' with the forum State."  *Id.* (emphasis in original).

ED&F took actions to create a substantial connection with Kentucky.  First, it maintained

a three-year business relationship with Tew.  *See id.* (finding purposeful availment when, inter

alia, "the parties did not engage in a one-time transaction, but in a continuing business

relationship that lasted a period of many years").  Second, it allegedly directed routine,

fraudulent emails into Kentucky via Tew's email address.  "[T]hese false [email] representations

are [at] the heart of th[is] lawsuit—they were not merely incidental communications sent by the

defendant into [Kentucky]."  *Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001); *see id.* ("[T]he

actions of sending false information into [Kentucky] by [email] had foreseeable effects in

[Kentucky] and were directed at individuals in [Kentucky].").  And viewing the Complaint's

allegations in the light most favorable to the Plaintiffs, there's a reasonable inference that ED&F

initiated the sending of those emails.  *Cf. Karsh*, 154 F. App'x at 462.  Third, it allegedly

withdrew funds from Tew's account at Central Bank in Lexington, Kentucky.  This enough to

demonstrate purposeful availment.  *See Int'l Techs. Consultants, Inc. v. Euroglas S.A.*, 107 F.3d

386, 391 (6th Cir. 1997) ("Where there has been no evidentiary hearing to resolve apparent

factual questions, the plaintiff need only make a prima facie showing of personal jurisdiction.).

### b

Second, the "arising out of" prong is satisfied as well.  The rule requires only "that the

cause of action . . . have a substantial connection with the defendant's in-state activities."  *Hall*,

359 F. Supp. 3d at 512 (quoting *Mohasco*, 401 F.2d at 384 n.27).  This requirement "is a lenient

one."  *Id.*

And the Plaintiffs easily meet it.  Moreover, the substantial connection here is rather

obvious.  The fraudulent emails form a basis for the fraud, negligent misrepresentation, and

breach of fiduciary duty claims.  Likewise, the withdrawal bears a substantial connection to the

funds that were ultimately embezzled and used as a conduit for tax fraud.  That, in turn, forms a

basis for the RICO, breach of contract, breach of fiduciary duty, conversion, unjust enrichment,

and equitably indemnity claims.

### c

Third, exercising jurisdiction over ED&F is reasonable.  The final prong of the due

process analysis commands that "the acts of the defendant or consequences caused by the

defendant [] have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Hall*, 359 F. Supp. 3d at 512–13 (quoting *Mohasco*, 401 F.2d at 381). Relevant considerations include "the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, and the interest of other states in securing the most efficient resolution of controversies." *Id.*

First, ED&F is headquartered in London. Nevertheless, it has been defending other lawsuits in the United States already. *See In re Customs & Tax Admin. of Kingdom of Denmark (SKAT) Tax Refund Litig.*, No. 18-MD-2865 (LAK), 2021 WL 4993536, at *2 n.10 (S.D.N.Y. Oct. 26, 2021) (collecting cases). Further, it is a sophisticated party. Additionally, Kentucky has a strong interest in adjudicating the action. *See Mohasco*, 401 F.2d at 385 ("[W]hen the contract is with a resident of [the forum state], the State's interest in resolving a suit based on the contract and brought by that resident cannot be doubted."). Tew, of course has a strong interest in obtaining relief, and in doing so in his chosen forum. Finally, any interest that the United Kingdom has in resolving this controversy does not outweigh the interests militating in favor of Kentucky. *See Bird v. Parsons*, 289 F.3d 865, 876 (6th Cir. 2002).

Having resolved these jurisdictional matters, the Court proceeds to address a litany of statute of limitations issues. Specifically, ED&F next asserts that the statute of limitations bars both the federal RICO claims and the state claims. ED&F is right on the federal claims, wrong on the state claims.

## C

Start with RICO. Both sides agree that the statute of limitations on a RICO claim is 4 years. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 183 (1997); *Rotella v. Wood*, 528 U.S. 549, 554 (2000). And it's undisputed that the relevant conduct occurred between 2012 and 2015.

Plaintiffs filed suit in 2023, apparently at least four years too late. Not to worry, Plaintiffs urge: any facial untimeliness should be cured by equitable tolling or the discovery rule. The Court is not persuaded.

For starters, "plaintiffs' RICO claims accrue[] when they 'knew or should have known of [the] injury.'" *Baltrusaitis v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 86 F.4th 1168, 1177 (6th Cir. 2023) (quoting *Rotella*, 528 U.S. at 553)). Further, "equitable tolling is a narrow exception that should be 'applied sparingly.'" *Eitel v. PNC Bank, N.A.*, No. 3:20-CV-12-RGJ, 2023 WL 2230866, at *12 (W.D. Ky. Feb. 24, 2023) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)). Tolling places the burden on plaintiffs to show "defendants' fraudulent concealment of the RICO injury and their own due diligence." *Osborn v. Griffin*, 50 F. Supp. 3d 772, 806–07 (E.D. Ky. 2014), *aff'd*, 865 F.3d 417 (6th Cir. 2017). "Equitable tolling 'is not appropriate' when 'a lack of due diligence' results in a substantial delay bringing a claim once facts are known to the plaintiff." *Eitel*, 2023 WL 2230866, at *12.

These rules sound simple enough. But the parties dispute how they apply. On the Plaintiffs' view, the clock starts ticking when they discover the *source* of their injury. The Defendants disagree, urging instead that discovery of the injury, itself, triggers the RICO countdown.

## 1

Although the Sixth Circuit has not definitively addressed the issue, the Defendant's view finds stronger support in the case law. *See Baltrusaitis*, 86 F.4th at 1177 ("[P]laintiffs knew they had been harmed in 2011 or 2012, and the statute of limitations began to run at that time."); *id.* (rejecting "the injury-and-pattern discovery test announced in our pre-*Rotella* caselaw"); *Rotella*,

528 U.S. at 555 ("[W]e have been at pains to explain that discovery of the injury, not discovery

of the other elements of a claim, is what starts the clock."); *but see Hood v. United States Postal*

*Serv.*, No. 17-1048, 2017 WL 6988055, at *2 (6th Cir. Oct. 11, 2017) (appearing to suggest that

knowledge of the source matters for the purposes of the RICO discovery rule). The Court need

not definitively decide the issue because even if the Plaintiffs' understanding of the rule is

correct, their claims are still untimely.

Here, the RICO injuries alleged are the Plaintiffs' loss of funds and the fact that they

were ultimately "forced to agree" to settle the 2018 SKAT suit. [R. 1 at 24–28.] At the outset,

Plaintiffs were on notice of a problem in 2015 when Tew couldn't access his funds or get in

contact with ED&F. And the Complaint indeed suggests that, by that point, Tew knew

something was wrong. He states that he was so concerned in 2015 that he "considered" traveling

to London to "confront ED&F in person[.]" [R. 1 at 14.] Even on his own interpretation of the

RICO discovery rule, that allegation suggests that by 2015, Tew strongly suspected the source of

his injury.

Still, construing the allegations in the light most favorable to Tew, the Court will

generously assume he lacked notice in 2015. Even operating on that assumption, the claims are

still untimely. Plaintiffs were certainly on notice by 2018 when SKAT sued them in an MDL in

the Southern District of New York. SKAT's Complaint alleged that "Tew and [Bluegrass]

defrauded [SKAT] by submitting tax refund claims through Global Equities claiming

shareholdings in Danish companies that did not exist, and by submitting tax vouchers through

ED&F that similarly purported to show the claimants' non-existent shareholdings." [R. 1 at 15.]

Certainly, a lawsuit of that nature is a "storm warning" at the very least (if not an outright storm).

*See Sims*, 151 F. App'x at 436 ("A plaintiff need only be aware of storm warnings but does not

need to hear[] thunder and see [] lightning.") (internal citation omitted).  Indeed, the Complaint, itself, indicates that other pension plans in similar situations discovered their injury and its source after reading SKAT's Complaint.  Four other defendants in the SKAT suit "brought third-party complaints against ED&F in the MDL[.]"  [R. 1 at 23.]  So even if Tew were correct about the purported knowledge of source rule, it wouldn't affect the outcome here.  Plaintiffs were on notice of the injury and its source by 2018.

Even if (as Tew alleges) he believed the SKAT Complaint was either frivolous or somehow attributable to Arunvill, it was incumbent upon him to at least investigate why he and Bluegrass had incurred a $39 million lawsuit in the Southern District of New York.  It strains credulity to suppose that even after the trust was drained, the Defendant disappeared, and the Danish tax authority sued, the Plaintiffs still had no idea they'd been injured.

Finally, to the extent the Plaintiffs make an implicit argument for the separate accrual rule by citing their 2021 settlement as a new injury, that argument is unavailing.  The alleged predicate RICO acts occurred between 2012 and 2015.  And, in any event, the Sixth Circuit has "never" applied the separate accrual rule in civil RICO cases.  *Baltrusaitis*, 86 F.4th at 1178.  Accordingly, the discovery rule does not save these claims.

**2**

Nor does equitable tolling.  Tolling is apposite when a "plaintiff, without any fault or want of diligence or care on his part, is unable to discover the injury within the limitations period."  *Eitel*, 2023 WL 2230866, at *12 (internal citation and quotations omitted).  Because that is not the case here (for the reasons previously articulated), the RICO claims must be dismissed as time barred.

**D**

The state claims are a different story.[5]  Even though the Plaintiffs admit that the statute of limitations on their tort claims has expired, they seek safe harbor in the "confidential relationship" exception that sometimes saves otherwise time-barred state claims.

**1**

Claims for breach of fiduciary duty, unjust enrichment, and equitable indemnity are subject to a five-year statute of limitations.  Ky. Rev. Stat. Ann. § 413.120.  Further, claims for conversion have a two-year limitations period.  Ky. Rev. Stat. Ann. § 413.125.  Generally speaking, "the limitations period begins to run when: (i) the defendant's wrongful concealment is revealed to the plaintiff; or (ii) the plaintiff 'should have discovered his cause of action by reasonable diligence.'"  *Osborn*, 865 F.3d at 438 (internal citation omitted).  But there's an exception to the reasonable diligence component:

> When a cause of action mentioned in KRS 413.090 to 413.160 accrues against a resident of this state, and he by absconding or concealing himself or by any other indirect means obstructs the prosecution of the action, the time of the continuance of the absence from the state or obstruction shall not be computed as any part of the period within which the action shall be commenced.

Ky. Rev. Stat. Ann. § 413.190(2).  Typically, concealment requires an affirmative act. *Osborn*, 865 F.3d at 437.  But "where the law imposes a duty of disclosure, a failure of disclosure may constitute concealment[.]"  *Munday v. Mayfair Diagnostic Lab'y*, 831 S.W.2d 912, 915 (Ky. 1992).  Such is the case where the parties have a "confidential relationship." *Osborn*, 865 F.3d at 437.

---

[5] Under federal question jurisdiction, it might be appropriate for the court to decline to exercise jurisdiction over the pendent state law claims when the sole federal claim is dismissed.  But, here, it appears the Court has jurisdiction under both 28 U.S.C. § 1331 and 28 U.S.C. § 1332.  Accordingly, the Court will proceed to consider the state claims.

In the confidential relationship context, only *actual discovery* of the fraud triggers the countdown. *See Hernandez v. Daniel*, 471 S.W.2d 25, 26 (Ky. 1971); *Boone v. Gonzalez*, 550 S.W.2d 571, 574 (Ky. Ct. App. 1977) (explaining that, when the parties have a fiduciary relationship, "there [is] no duty on the part of the injured party to exercise due diligence to discover the fraud"); *Osborn*, 865 F.3d at 439–40 ("Kentucky law excuses plaintiffs' failure to discover defendants' wrongful conduct" when the defendant "abuses a confidential relationship to prevent the plaintiff from discovering her cause of action."). This carve-out makes good sense: "persons in a confidential relationship do not have the reason or occasion to check up on each other that would exist if they were dealing at arm's length." *McMurray v. McMurray*, 410 S.W.2d 139, 141–42 (Ky. 1966).

### 2

Nevertheless, it creates an interesting situation here. Namely that: (1) the Court has already concluded that Tew should have known about his injury by 2018; but (2) that conclusion may be immaterial to state tolling if the parties had a confidential relationship. *See Osborn*, 50 F. Supp. 3d at 807 (contrasting RICO's "stringent duty of due diligence" with Kentucky's more "beneficiary-friendly standards"). Hence, the operative question: was the parties' relationship confidential?

ED&F answers in the negative. On its view, it was a mere custodian of funds; not a fiduciary with heightened obligations.[6] Plaintiffs disagree, citing the trust they placed in ED&F to manage the brokerage account.

---

[6] "Confidential" and "fiduciary" do not appear to be synonyms. So far as the Court can tell, a fiduciary relationship is sufficient but not necessary to support a finding of a confidential relationship.

A confidential relationship "may exist under a variety of circumstances[.]" *Sec. Tr. Co. v. Wilson*, 210 S.W.2d 336, 338 (1948) (quoting *Abbitt v. Gregory*, 160 S.E. 896, 906 (N.C. 1931)). And "it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *See id.* (niece and uncle); *Adams v. Ison*, 249 S.W.2d 791, 793 (Ky. 1952) (doctor and patient); *see also Johnston v. CIGNA Corp.*, 916 P.2d 643, 646 (Colo. App. 1996) (investor and broker-dealer).

Tew alleges that he "entrusted ED&F, as broker-custodian for Bluegrass, with the management and control of the Bluegrass brokerage account, including the execution of securities transactions and the preparation of any related documentation." [R. 1 at 11]; *see RQSI Glob. Asset Allocation Master Fund, Ltd. v. Apercu Int'l PR LLC*, 683 F. App'x 497, 502 (6th Cir. 2017) (applying Kentucky law) ("[W]hether an investment advisor has a fiduciary duty depends on the nature of the customer's account and the amount of control exercised by the advisor."). The parties' "Custody Agreement" provides that Tew "appoints [ED&F] to act as bare trustee for the purposes of safekeeping the Client Property upon the terms of this Agreement[.]" [R. 8-2 at 4.] It was also authorized to "to collect and receive, for [Tew's] account, all payments (whether income or capital), income and dividends in respect of [Tew's] Property and to credit such to the Client Cash Account[.]" *Id.* at 9. It could do so without consulting Tew. *Id.* Further, ED&F was permitted to "execute on [Tew's] behalf such ownership and other certificates as may be required to obtain payment in respect of the Client Securities[.]" *Id.* Likewise, it could do that without first consulting with Tew. Given these terms, it is apparent that ED&F exercised a significant degree of control over Tew's accounts.

Further, ED&F allegedly provided Tew with fraudulent account statements and trading ledgers cataloguing the purported transactions that resulted in dividends being credited to the Bluegrass account.  [R. 1-1; R. 1 at 6 (alleging that "ED&F managed and controlled a brokerage account for Bluegrass, executed trades in European securities for Bluegrass, provided documentation and information to Bluegrass in connection with its account and securities transactions, and collected fees in connection with Bluegrass' withholding-tax refund requests."); R. 1 at 8 (explaining that Tew "was not licensed to trade securities outside the United States").] Those allegedly fraudulent account statements and trading ledgers were clearly intended to induce some degree of trust and reliance.  For all these reasons, it is fair to say that Tew "reposed confidence" in ED&F to manage his affairs in good faith.  *Sec. Tr. Co.*, 210 S.W.2d at 338.

Because the parties had a confidential relationship giving rise to a disclosure obligation, Tew's cause of action on those claims did not accrue until June 2021—when he states he actually discovered the fraud.  And because he filed his Complaint in December 2023, his claims for unjust enrichment, equitable indemnity, and breach of fiduciary duty are therefore timely.

**3**

But the conversion claim presents an added wrinkle.  That limitations period is relatively short: just two years.  Even with equitable tolling, the conversion claim still appears untimely. Plaintiffs apparently learned of the fraud at some time in June 2021, but they filed their complaint in December 2023.  However, Tew urges that the fact of his bankruptcy adversary proceeding (filed on June 14, 2023) saves his conversion claim because he filed this action within 90 days of his adversary action being dismissed for want of jurisdiction.  [Adv. Pro. R. 1]; *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 698 (E.D. Mich. 2010) ("A court

may also take judicial notice at the pleading stage of certain public documents, including filings in other courts of record and publicly filed disclosure documents.").

In support of that argument, he cites Kentucky Revised Statute § 412.270(1):

> If an action is commenced in due time and in good faith in any court of this state and the defendants or any of them make defense, and it is adjudged that the court has no jurisdiction of the action, the plaintiff or his representative may, within ninety (90) days from the time of that judgment, commence a new action in the proper court.  The time between the commencement of the first and last action shall not be counted in applying any statute of limitation.

§ 413.270(1).  Still, given his filing date of June 14, 2023 in the adversary proceeding, that statute only saves him if he discovered his injury in the latter half of June 2021.  To the extent Tew discovered his injury during the second half of June 2021 (which he implies but does not outright state), the Court will permit his conversion claim to proceed pursuant to § 413.270(1).

### E

Defendants next assert that the Plaintiffs' fraud and negligent misrepresentation claims are barred by the statute of repose—regardless of any finding of a confidential relationship.  An action for fraud or mistake "*shall* be commenced within ten (10) years after the time of making the contract or the perpetration of the fraud."  Ky. Rev. Stat. Ann. § 413.130(3) (emphasis added).  That provision "is properly characterized as a statute of repose, for it 'potentially bar[s] the plaintiff's suit *before the cause of action arises*.'"  *Dodd v. Dyke Indus., Inc.*, 518 F. Supp. 2d 970, 973 (W.D. Ky. 2007) (internal citation omitted); *In re Woods*, 558 B.R. 164, 172 (Bankr. W.D. Ky. 2016) ("Kentucky's statute of repose imposes an *absolute* bar to actions for fraud commenced more than ten years after the perpetration of the fraudulent act.") (emphasis added).  "This means a plaintiff's cause of action might be "destroyed before it legally existed," *i.e.* even if the plaintiff never learned of the fraud." *Dodd*, 518 F. Supp. 2d at 973 (quoting *McCollum v.*

*Sisters of Charity of Nazareth Health Corp.*, 799 S.W.2d 15, 18 (Ky. 1990))); *see also Hernandez v. Daniel*, 471 S.W.2d 25, 27 (Ky. 1971). "The United States Supreme Court 'repeatedly has stated in broad terms that statutes of repose are not subject to equitable tolling.'" *Eitel v. PNC Bank, N.A.*, No. 3:20-CV-12-RGJ, 2023 WL 2230866, at *13 (W.D. Ky. Feb. 24, 2023) (quoting *Cal. Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2050–51 (2017)).

### 1

How does this apparently obstinate statute of repose square with the tolling rule for concealment? As Judge Heyburn has reasoned, "it is not clear[.]" *Dodd*, 518 F. Supp. 2d at 973. This haziness, Judge Heyburn explained, is possibly due to "the difficulty of envisioning a situation in which a cause of action for fraud could have accrued (*i.e.* been discovered), yet could have been 'concealed' for the purposes of this provision." *Id.* "Perhaps due to this conceptual difficulty, Kentucky courts have by this Court's reckoning thus far only applied § 413.190(2) to 'keep alive' a fraud claim beyond 10 years in the context of a fiduciary relationship[.]" *Id.* (citing *Sec. Tr. Co. v. Wilson*, 210 S.W.2d 336 (1948)). In *Security Trust*, a niece brought an action against her uncle's estate for fraudulently converting her inherited property. *Sec. Tr. Co.*, 210 S.W.2d at 336. Because of the defendant's status as her uncle and guardian, the parties had a fiduciary relationship. *Id.* at 337. As a consequence, the court appeared to toll both the statute of limitations and the statute of repose. *Id.*

### 2

Notwithstanding that singular example, more recent Kentucky authority counsels against equitable tolling for statutes of repose. *See Hernandez v. Daniel*, 471 S.W.2d 25, 27 (Ky. 1971) (fraud claim barred by statute of repose notwithstanding discovery rule); *McCollum*, 799 S.W.2d

at 18 ("Statutes of limitations limit the time in which a plaintiff may bring suit *after a cause of action accrues*, whereas statutes of repose potentially bar the plaintiff's suit *before the cause of action arises*.") (emphasis in original); *Coslow v. Gen. Elec. Co.*, 877 S.W.2d 611, 612 (Ky. 1994) (same); *Tabler v. Wallace*, 704 S.W.2d 179, 184 (Ky. 1985), *overruled on other grounds by Calloway Cnty. Sheriff's Dep't v. Woodall*, 607 S.W.3d 557 (Ky. 2020) (describing statutes of repose "as a one-way ticket to 'Topsy-Turvy Land,' . . . where you 'die before you are conceived, or be divorced before ever you marry, or harvest a crop never planted, or burn down a house never built, or miss a train running on a nonexistent railroad.'" (quoting *Dincher v. Marlin Firearms Co.*, 198 F.2d 821, 823 (2d Cir. 1952) (J. Frank, dissenting))); *Hoskins' Adm'r v. Ky. Ridge Coal Co.*, 305 S.W.2d 308, 311 (Ky. 1957) ("[T]he time for recovery for damages from a fraudulent act *cannot* be extended beyond ten years from the time of the act even though the act, itself, may not have been discovered within that period.") (emphasis added); *see also CTS Corp. v. Waldburger*, 573 U.S. 1, 9 (2014) ("Statutes of repose . . . generally may not be tolled, even in cases of extraordinary circumstances beyond a plaintiff's control."); *In re Woods*, 558 B.R. 164, 172 (Bankr. W.D. Ky. 2016).

Further, the Plaintiffs' Response brief does not appear to make any substantive argument against applying the statute of repose. Because it appears that equitable tolling does not apply to the ten-year statute of repose for fraud and mistake, the Court will dismiss any claims for fraud and negligent misrepresentation having to do with ED&F's conduct before December 2013.

## F

Finally, ED&F requests application of Kentucky's borrowing statute to the breach of contract claim. In Kentucky, an action upon a written contract executed before July 15, 2014, is subject to a fifteen-year statute of limitations. Ky. Rev. Stat. Ann. § 413.090(2). However, under

24

certain circumstances, Kentucky will "borrow" the limitations period of another jurisdiction.  Ky. Rev. Stat. Ann. § 413.320; *Combs v. Int'l Ins. Co.*, 163 F. Supp. 2d 686, 691 (E.D. Ky. 2001), *aff'd*, 354 F.3d 568 (6th Cir. 2004).  To determine whether the borrowing statute applies, courts conduct a "three-step analysis[:]"

> (1) did the cause of action accrue in another state?  (2) If so, is that state's statute of limitations for the particular cause of action shorter than the corresponding Kentucky statute of limitations?  (3) If so, application of the accrual state is applied; if not, Kentucky's statute of limitations is applied.

*Swanson v. Wilson*, 423 F. App'x 587, 593 (6th Cir. 2011).

### 1

The Supreme Court of Kentucky has not directly addressed the question where a breach of contract claim accrues.  *See, e.g.*, *Combs*, 354 F.3d at 593.  However, after a thorough review, this Court has previously concluded that "[t]he law of the Sixth Circuit, the appellate Courts of Kentucky, and our fellow district courts supports the general principle that a cause of action accrues when and where a contract is breached."  *Conway v. Portfolio Recovery Assocs., LLC*, No. 3:13-CV-007-GFVT, 2017 WL 3908682, at *7 (E.D. Ky. Sept. 5, 2017) (collecting cases); *Cornett v. Student Loan Sols., LLC*, 672 S.W.3d 852, 857 (Ky. Ct. App. 2023), *review denied* (Aug. 16, 2023) ("A breach of contract action is said to ripen or accrue at the time of its breach— that is, the date of the 'promised performance.'"); *see also Swanson*, 423 F. App'x at 593 ("[W]here the location of accrual is not readily apparent, this Court has looked to *when* a cause of action accrued to determine the *place* of accrual.") (emphasis in original).

Here, the cause of action accrued in the United Kingdom.  Plaintiffs' Complaint alleges that the breach occurred when ED&F (1) failed to conduct dividend arbitrage trading and (2) falsified account statements, tax vouchers, and trading ledgers.  [R. 1 at 30.]  "Moreover, all of

the alleged wrongful conduct occurred at the [ED&F] offices in [London]." *Willits v. Peabody Coal Co.*, 188 F.3d 510, 13 (6th Cir. 1999) (Table).  That Tew's injury was felt in Kentucky does not change that fact.  *See id.* ("It would be unworkable and irrational to hold that the cause of action accrued wherever each Plaintiff happened to receive his or her deficient check."); *cf. Cornett*, 672 S.W.3d at 857 (applying Kentucky's statute of limitations because defendant "was in Kentucky when she [breached the contract by] fail[ing] to make [] timely payments").

### 2

Further, The United Kingdom has a six-year statute of limitations on claims for breach of contract.  *See Limitations Act 1980*, c. 58, § 5 (Eng.).  The United Kingdom's limitations period is therefore shorter than Kentucky's fifteen-year limitations period.  Accordingly, the Court will "borrow" the United Kingdom's limitations period and dismiss Plaintiff's breach of contract claim as time barred.

### G

Finally, ED&F advances a variety of technical arguments about Tew's failure to plead his surviving claims properly.  The Court will address each in turn.

### 1

First, ED&F asserts that Tew's claims for fraud and misrepresentation (to the extent they concern ED&F's conduct from December 2013 onward) fail to meet applicable pleading requirements.  ED&F correctly indicates that both claims are subject to Federal Rule of Civil Procedure 9(b)'s heightened pleading standard for fraud claims.  Fed. R. Civ. P. 9(b); *see also Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 247 (6th Cir. 2012) ("The only Kentucky decision to address directly pleading requirements for negligent misrepresentation

noted: 'Like fraud, allegations of negligent misrepresentation must be pled with particularity.'"

(quoting *Thomas v. Schneider*, No. 2009–CA–002132–MR, 2010 WL 3447662, at *1 n. 2 (Ky.

Ct. App. Sept. 3, 2010))).

Ordinarily, claims challenged under 12(b)(6) must satisfy the familiar "plausibility"

standard. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But the pleading standard for the

fraud and misrepresentation plaintiff is heightened. Specifically, the fraud plaintiff "must state

with *particularity* the circumstances constituting fraud[.]" Fed. R. Civ. P. 9(b) (emphasis

added). To plead with particularity, a plaintiff must provide "the time, place, and content of the

alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent

of the defendants; and the injury resulting from the fraud." *Coffey v. Foamex L.P.*, 2 F.3d 157,

161–62 (6th Cir. 1993) (internal citation omitted). The purpose of this heightened standard is to

"place[] the defendant on 'sufficient notice of the misrepresentation'" so that the he may respond

in an "informed" fashion. *Coffey*, 2 F.3d at 162 (quoting *Brewer v. Monsanto Corp.*, 644 F.

Supp. 1267, 1273 (M.D. Tenn. 1986)).

### a

First, Plaintiffs plead the elements of fraud. In Kentucky, "a fraud claim requires that a

plaintiff establish six elements by clear and convincing evidence: (1) a material

misrepresentation, (2) which is false, (3) known to be false or made recklessly, (4) made with

inducement to be acted upon, (5) acted in reliance thereon, and (6) causing injury." *Derby City

Cap., LLC v. Trinity HR Servs.*, 949 F. Supp. 2d 712, 726 (W.D. Ky. 2013).

Plaintiffs allege that "ED&F materially misrepresented that tax vouchers were submitted

for taxes (a) Bluegrass actually paid to foreign tax authorities, (b) on dividends Bluegrass

actually received, (c) on shares Bluegrass actually owned, and (d) on the dates those dividends were paid." [R. 1 at 28.] Those misrepresentations were allegedly made in the fraudulent trading records emailed to Tew. *Id.* Thus, the Complaint easily alleges that ED&F knowingly made false representations about the tax vouchers. It also alleges that ED&F intended to induce reliance when it directed fraudulent documents to Tew's email. Finally, Tew states that he did rely on those documents, and that he was damaged as a consequence.

ED&F disagrees, and instead queries how Tew could have relied on the purportedly fraudulent vouchers when they were never sent to him directly. But that argument misses the point: Tew alleges that he relied on ED&F's representations *to him* about the vouchers. For all these reasons, he states a claim.

**b**

Next, the Plaintiffs allege negligent misrepresentation based on these same allegations. A negligent misrepresentation claim requires that:

> 1) the transaction at issue is one in which the defendant had a pecuniary interest; 2) the defendant supplied false information; 3) the information was supplied for others' guidance in their business transactions; 4) the defendant failed to exercise reasonable care in communicating the information; 5) the plaintiff acted in reliance thereon; and 6) the false information caused injury.

*Helton v. Am. Gen. Life Ins. Co.*, 946 F. Supp. 2d 695, 707 (W.D. Ky. 2013).

First, it is reasonable to infer from the Complaint that the Defendant had a pecuniary interest in the transaction between the parties. Second, Tew alleges the provision of false information via doctored records sent to his email. Third, he strongly suggests that the information was intended to guide the plaintiffs. Fourth, Plaintiffs state that ED&F acted at least negligently (if not outright intentionally) when it communicated the false trading ledgers,

voucher information, and account statements.  Finally, as previously explained, he alleges reliance and damages.

c

Further, Plaintiffs satisfy Rule 9(b)'s particularity requirement.  First, they identify ED&F as the source of the representations.  [R. 1 at 29 ("ED&F made these material misstatements and omissions in the tax vouchers themselves and in the documentation reflecting trade records that was provided to Plaintiffs.").]  They also identify the time, place, and content of the misrepresentations: specifically that the emails were sent repeatedly from ED&F in London to Tew in Kentucky, that they contained specific false representations about the accounts and tax vouchers, and that this occurred repeatedly from 2012 to 2015.  They provide extensive detail about the allegedly fraudulent scheme, the intent of the defendants, and the resulting injuries.  And although Tew does not provide specific dates for every single instance of misrepresentation or concealment, "[c]ourts [assessing 9(b) particularity] are [] more lenient when the alleged wrong did not occur at a discrete time and place and instead 'the transactions involved are complex or cover a long period of time.'"  *Pascarella v. Swift Transp. Co.*, 694 F. Supp. 2d 933, 941 (W.D. Tenn. 2010) (internal citation omitted).  The allegations are sufficient to put the Defendant on notice.  The Court declines to dismiss the fraud and negligent misrepresentation claims.

2

Next, ED&F urges that the claims for fraud and negligent misrepresentation are fatally flawed because they "fail to state a duty independent from contract."  [R. 8 at 32.] But that's not quite right.  *Cf. Nash-Finch Co. v. Casey's Foods, Inc.*, No. 6:15-CV-00086- GFVT, 2016 WL 7106395, at *7 (E.D. Ky. Dec. 5, 2016), *aff'd*, 762 F. App'x 218 (6th Cir.

29

2018) (dismissing fraud and negligent misrepresentation claims because their "close relationship" to a breach of contract issue foreclosed liability under the economic loss doctrine); *see also id.* (dismissing additional claims because "the failure to perform a contractual obligation typically does not give rise to a cause of action in tort unless a plaintiff can establish the existence of an independent legal duty.") (internal citation omitted)

First, to the extent ED&F cites the economic loss doctrine, that rule applies to commercial contracts for the sale of products and is therefore inapposite. *Giddings & Lewis, Inc. v. Indus. Risk Ins.*, 348 S.W.3d 729, 733 (Ky. 2011) (explaining that the economic loss doctrine serves to "prevent[] the commercial purchaser of a product from suing in tort to recover for economic losses arising from the malfunction of the product itself, recognizing that such damages must be recovered, if at all, pursuant to contract law."); *see id.* ("Today we hold that the economic loss rule applies to claims arising from a defective product sold in a commercial transaction[.]").

Second, to the extent ED&F argues that the tort claims are inextricably intertwined with a contractual duty, the court will reject that argument at the pleading stage. *See, e.g.*, *Laurel Grocery Co., LLC v. Freshway, Inc.*, No. 6:18-CV-243-REW, 2019 WL 7290469, at *8 (E.D. Ky. Dec. 30, 2019) ("The Commonwealth [] recognizes that fraud claims, premised on, at bottom, a duty of honesty in qualifying circumstances, stand independent of any contract duty."); *Eifler v. Greenamyer*, No. 2017-CA-000079-MR, 2019 WL 2712618, at *6 (Ky. Ct. App. June 28, 2019) ("[I]t was permissible for [plaintiff] to plead breach of contract and fraud in the alternative[.]"). And further, in any event, the Court has already dismissed the breach of contract claim as time barred. Again, the Court declines to dismiss the fraud and negligent misrepresentation claims.

30

**3**

Next, ED&F contends that the Plaintiffs fail to state a claim for breach of fiduciary duty when they don't allege that such a duty existed.  The Court disagrees.  For the reasons stated in the state law equitable tolling analysis, the Court has already found that Plaintiffs at least allege a fiduciary duty.

**4**

Finally, ED&F asserts that the claims for conversion, unjust enrichment, and equitable indemnity cannot survive 12(b)(6) scrutiny.  These issues can be resolved in relatively short order.

**a**

Start with the conversion claim.  The conversion plaintiff must allege the following:

> (1) the plaintiff had legal title to the converted property;
>
> (2) the plaintiff had possession of the property or the right to possess it at the time of the conversion;
>
> (3) the defendant exercised dominion over the property in a manner which denied the plaintiff's rights to use and enjoy the property and which was to the defendant's own use and beneficial enjoyment;
>
> (4) the defendant intended to interfere with the plaintiff's possession;
>
> (5) the plaintiff made some demand for the property's return which the defendant refused;
>
> (6) the defendant's act was the legal cause of the plaintiff's loss of the property; and
>
> (7) the plaintiff suffered damage by the loss of the property.

*C&H Mfg., LLC v. Harlan Cnty. Indus. Dev. Auth., Inc.*, 600 S.W.3d 740, 745 (Ky. Ct. App. 2020).

First, ED&F asserts that "legal title is an essential element of conversion, and under Kentucky law, a deposit of funds generally passes legal title, rendering Plaintiffs' conversion claim here a 'legal impossibility.'"  [R. 8 at 33–34.]  Again, this argument fails.  Here's why: there's no indication that Tew actually passed title or ownership of the money in the accounts to ED&F.  Rather, the Custody Agreement explains that although ED&F was to act as custodian for the Client Securities, "such Client Securities belong to the Client."  [R. 8-2 at 6]; *see also id.* at 4 ("The Client hereby appoints the Custodian to act as bare trustee for the purposes of safekeeping the Client Property[.]").  Finally, Plaintiffs' Complaint alleges that they "had legal title to the funds in the Bluegrass brokerage account[.]"  [R. 1 at 31.]

Second, ED&F states that the conversion claim is impermissibly intertwined with any contract claim.  The Court disagrees.  The conversion claim hinges on the embezzlement of Plaintiffs' funds which, while related to the underlying contract, amount to more than just a contractual injury.  *See Boling v. Prospect Funding Holdings, LLC*, 324 F. Supp. 3d 887, 898 (W.D. Ky. 2018) ("[T]o assert a conversion claim in conjunction with a contract law claim, the claimant must show that 'he sustained tort damages or a loss independent of the contract[.]'" (quoting *Jones v. Marquis Terminal, Inc.*, 454 S.W.3d 849, 854 (Ky. App. 2014))).  And, in any case, the breach of contract claim has at this point been dismissed.

Third, ED&F rehashes arguments about the specificity of damages.  [R. 8 at 34.]  Yet again, the Court will reject this line of reasoning.  A dispute over the precise amount of damages does not command summary dismissal.  At the 12(b)(6) stage, Plaintiffs plausibly allege damages.

**b**

Next, ED&F states that Plaintiffs fail to state a claim for unjust enrichment.  The unjust enrichment plaintiff must establish: "(1) benefit conferred upon defendant at plaintiffs expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value."  *Furlong Dev. Co., LLC v. Georgetown-Scott Cnty. Plan. & Zoning Comm'n*, 504 S.W.3d 34, 39–40 (Ky. 2016).

First, ED&F states that "Plaintiffs fail to allege how any benefit conferred on ED&F—presumably, the alleged retention of profits from supposedly fraudulent transactions—was to Plaintiffs' detriment, when, on Plaintiffs' theory, Plaintiffs were not entitled to those profits, either."  [R. 8 at 35.]  The Court agrees.  Plaintiffs' allegations of unjust enrichment pertain to the fraudulent tax vouchers allegedly submitted to "SKAT and other foreign tax authorities."  [R. 1 at 32.]  Specifically, they state that "it would be unjust for ED&F to retain the profits it collected in connection with Bluegrass' transactions and withholding-tax refunds if the underlying tax vouchers are false as admitted by ED&F or alleged by the tax authorities."  *Id.* That may well be true.  But it's neither here nor there.  SKAT is not a party, and Plaintiffs aren't entitled to recover for SKAT's damages.

Additionally, as ED&F points out, "[i]n the presence of written or oral agreements between parties, courts applying Kentucky law have consistently barred claims of unjust enrichment."  *Ham Broad. Co., Inc. v. Cumulus Media, Inc.*, No. 5:10-CV-00185-R, 2011 WL 13232371, at *4 (W.D. Ky. Oct. 17, 2011).  For all these reasons, the Court will dismiss the Plaintiffs' unjust enrichment claim.

**c**

Finally, ED&F challenges Plaintiffs' claim for equitable indemnity.  The equitable

indemnity plaintiff must allege that: "1) he is subject to liability, but 2) he is exposed to such

liability as a result of the actions of another person and that 3) the other person should as a matter

of public policy in law or equity be required to make good the party's loss."  *Long v. Illinois*

*Cent. Gulf R. Co. in Paducah, Ky.*, 660 F. Supp. 469, 471 (W.D. Ky. 1986).  "[T]he indemnitee

must allege that the indemnitee was subject to actual legal liability."  *Id.* at 473.  In other words,

he must show that "his liability was certain, and that there was no impediment or defense to the

claim against him."  *Id.* at 472.

On ED&F's view, the Plaintiffs are stymied at the very first element.  First, it argues, the

cited settlement amount does not "reflect a payment owed by Plaintiffs to SKAT, for it is simply

the amount of an allowed claim in the Tew Bankruptcy."  [R. 8 at 35–36.]  Second, ED&F

asserts the Bluegrass Trust was not a debtor in bankruptcy nor a party to the settlement and

therefore owes no monetary obligation to SKAT.  *Id.*  ED&F is wrong on the first count, right on

the second count.

The Court will take each Plaintiff's equitable indemnity claim in turn.  Start with Mr.

Tew.  Because he settled the SKAT claims, and because the settlement amount is considered an

allowed claim, the Court will permit his equitable indemnity claim to proceed at this stage.  *Bank*

*of Am., N.A. v. Caulkett*, 575 U.S. 790, 793 (2015) ("[A] claim filed by a creditor is deemed

'allowed' under § 502 if no interested party objects or if, in the case of an objection, the

Bankruptcy Court determines that the claim should be allowed under the Code." (citing 11

U.S.C. § 502 (a)-(b))); *In re Tew*, No. 20-51078, 2023 WL 7981684, at *2 (Bankr. E.D. Ky. Nov.

16, 2023) ("[The Tews' Plan] provides the Reorganized Debtors' 'Disposable Income,' as well

as quarterly $3,000 payments from Debtors, would be used to pay allowed unsecured claims (after payment of allowed administrative and priority claims)[.]"); [R. 8-10 (Approved Settlement Agreement) ("The SKAT Claims (as defined in the Motion) are hereby ALLOWED as unsecured, Class 7 claims under the Debtors' Amended Chapter 11 Plan and any such further amended plan submitted by the Debtors to the Court.").

However, the Plaintiffs don't allege that Bluegrass Trust is liable to SKAT.  And Bluegrass doesn't appear to be a party to the settlement or a debtor in bankruptcy.  Because Bluegrass Trust fails to allege that it "is subject to liability," the Court will dismiss its equitable enrichment claim.[7]  *Long*, 660 F. Supp. at 471.

## III

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. Defendant's Motion to Dismiss **[R. 8]** is **GRANTED IN PART** and **DENIED IN PART**;

2. Plaintiffs' RICO claims are **DISMISSED**;

3. Plaintiffs' Claims for fraud and negligent misrepresentation are **DISMISSED** to the extent they arise out of ED&F's conduct prior to December 28, 2013;

4. Plaintiffs' breach of contract claims are **DISMISSED**;

5. Plaintiffs' unjust enrichment claims are **DISMISSED**;

---

[7] Finally, ED&F argues briefly that this case should be dismissed for improper venue and failure to join an indispensable party.  *See* Fed. R. Civ. P. 12(b)(3), 12(b)(7).  The Court will reject both arguments.  First, "a defendant not resident in the United States may be sued in any judicial district[.]"  28 U.S.C. § 1391.  Thus, Defendant's venue argument is unavailing.  Second, ED&F's Rule 19 argument is rather speculative and perfunctory.  The Court will deny any motion under Rule 12(b)(7) without prejudice to the Defendant's ability to pursue that issue in a developed motion.

6.  The Bluegrass Trust's equitable indemnity claim is **DISMISSED**; and

7.  Bernard Tew (in his capacity as trustee) is hereby **SUBSTITUTED** for Bluegrass Trust as a Plaintiff in this matter.

This the 27th day of September, 2024.

Gregory F. Van Tatenhove
United States District Judge